854 A.2d 1232

**Eric HORRIDGE, et al.**

v.

**ST. MARY'S COUNTY DEPARTMENT OF SOCIAL SERVICES, et al.**

**No. 80, Sept. Term, 2003.**

Court of Appeals of Maryland.

July 28, 2004.

172

Stephen B. Mercer (Sandler & Mercer, P.C., Rockville), on brief, for Appellants.

Joshua N. Auerbach, Murnaghan Appellate Advocacy Fellow, Baltimore, Brief of Amici Curiae Public Justice Center and Advocates for Children and Youth.

Shelly E. Mintz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Elise Song Kurlander, Asst. Atty. Gen., Baltimore), on brief, for Appellees.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE, JJ.

WILNER, Judge.

Maryland law requires any person having reason to believe that a child has been subjected to abuse or neglect to make a fairly detailed report to either the local department of social services (DSS), which is a unit of the State Department of Human Resources and therefore a State agency, or an appropriate law enforcement agency. The law requires DSS, promptly after receiving such a report, to make a "thorough investigation" in order to protect the health, safety, and welfare of the child. Part of that requirement is the directive that, if the report is of physical or sexual abuse, DSS must, within 24 hours, "see the child," attempt to have an on-site interview with the child's caretaker, and decide on the safety of the child.

The principal questions before us are whether (1) the statutory obligation to conduct a thorough investigation and take appropriate steps to protect the child creates a civil duty on the part of DSS to the child who is the subject of a report of abuse, and (2) if so, and subject to the State Tort Claims Act, liability exists on the part of the State or individual social workers if harm ensues to a child because of a negligent

breach of that duty.  We shall answer both questions in the affirmative.

## BACKGROUND

In an amended complaint filed in the Circuit Court for Anne Arundel County, plaintiff, Eric Horridge, alleged that, between December, 1999, and February, 2000, he made eight reports to the St. Mary's County DSS of physical abuse being inflicted on his nineteen-month-old son Collin by Collin's mother or her boyfriend, that a neighbor also reported that Collin was being abused, that DSS failed to make a thorough investigation and take steps to protect Collin, as required by law, and that, as a result of that failure, Collin remained in mortal danger and, in fact, was beaten to death by his mother or her boyfriend eight days after the last report was made and ignored.  The complaint charged the State and two DSS social workers, Briana Shirey and Deborah Walsh, with negligence, intentional infliction of emotional distress on Collin, and depriving Collin of his State Constitutional right to procedural and substantive due process, and it added a count against the State for negligent selection, supervision, and retention of Ms. Shirey and Ms. Walsh.

The court dismissed the complaint as failing to state a cause of action upon which relief can be granted.  Its decision was ultimately grounded on its conclusion that no duty was owed to Collin by any of the defendants and that, even if a duty were owed to him, the breach of that duty was not the proximate cause of the harm that ensued.  Horridge appealed, and we granted *certiorari* prior to proceedings in the Court of Special Appeals.

Because the complaint was dismissed on the ground that it failed to state a cause of action, the issues before us are purely ones of law.  We must assume the truth of all well-pled factual allegations in the complaint, as well as any reasonable inferences that may be drawn from those allegations.  *Adamson v. Correctional Medical,* 359 Md. 238, 246, 753 A.2d 501, 505 (2000); *Muthukumarana v. Montgomery County,* 370 Md.

447, 474, 805 A.2d 372, 388 (2002). Accordingly, we shall recite as fact that which, at this point, is merely alleged.

Collin was born in Texas, in June, 1998, to plaintiff, Eric Horridge, and Tiffany Fairris. In October, 1999, Ms. Fairris moved to St. Mary's County, Maryland, along with Collin, his three-year-old sister, Erica, and Ms. Fairris's boyfriend, Daniel Fowkes. Plaintiff remained in Texas. In December, 1999, he reported to "Defendants" that Collin was being abused. That abuse, the complaint alleges, "arose out of a series of telephone conversations that [Horridge] had with Tiffany Fairris during which she would physically abuse Collin while threatening Eric Horridge with never seeing his son again." The complaint does not indicate what, if anything, DSS did in response to that initial report. The two calls that are of particular importance were those that occurred later, in January and February, 2000.

On or about January 24, 2000, during the course of a telephone call to Maryland, Horridge "heard Collin screaming and crying in the background because Tiffany Fairris was hitting him and had pushed him into a wall." He "immediately contacted the Defendants and provided them with detailed information about the physical injuries that Collin was suffering." Horridge also informed the defendants that Fairris abused drugs in the children's presence, that she became more abusive when under the influence of drugs and alcohol, that she had another child in Texas who had been abused while in her care, that a Texas court had restricted her right of visitation with that child, and that Fairris had threatened to abuse Collin in retaliation for Horridge having initiated custody proceedings in Texas.

On January 28, 2000—four days after that call was received—the defendants "purported to conduct an on-site visit" with Collin, but, according to the amended complaint, failed to conduct a thorough investigation of the reported abuse. During the on-site visit, defendant Shirey observed circular bruising on Collin "that was consistent with the particulars of the abuse reported by [Horridge] to the Defendants, and which

was inconsistent with normal toddler play," but Shirey declined to remove Collin from the home, have a doctor examine him, monitor the home environment, or take any other action to protect Collin. Instead, the defendants "purported to rely upon a statement, taken in the presence of the suspected abuser(s), from Collin, a nineteen-month-old toddler whose linguistic ability was limited to single words, in which he attributed his injuries to play activities." On February 2, 2000, the Defendants closed the case without taking any further action.

On or about February 17, 2000, Fairris informed Horridge that she would abuse Collin in retaliation for his reports of abuse. Horridge immediately reported that threat to the defendants, but they refused to investigate it. Instead, Shirey accused Horridge of being a "disgruntled parent" and told him that "she did not care about his report because the case was closed." Walsh instructed him "not to call back again with a report of abuse concerning [Collin]." Apart from Horridge's complaints, "a concerned neighbor with personal knowledge of abuse or neglect of [Collin], also made a report, at a time or times to be determined, to DSS that [Collin] was being abused or neglected," but the defendants essentially ignored that report as well.

On February 25, 2000, Collin was beaten to death by Fairris or her boyfriend, Fowkes. The autopsy revealed that Collin died from multiple blunt force injuries, including "multiple abrasions and contusions of varying ages, scalp hemorrhage, lacerations of the liver, contusions of the right lung, lacerations of the pancreas, lacerations of the mesent[e]ry and mesenteric lymph nodes [membranes that connect the intestines to the dorsal abdominal wall], hemorrhage within the soft tissues of the anterior mediastinum [the space containing the heart and viscera of the chest, other than the lungs], perirenal adipose, pelvic soft tissues, and within the anterior diaphragm, multiple serosal contusions of the bowel, pulmonary edema and congestion." The autopsy also revealed "numerous and significant wounds on his body that were more than seven days old," including wounds "that were circular in appearance;

wounds that are consistent with Collin being struck by an adult hand or knuckles and the reports by [Horridge] of physical abuse being inflicted on Collin by [Fairris or Fowkes]."

The nine-count amended complaint stated four counts of negligence—two against the State (DSS) and two against Shirey and Walsh. In Count I, against DSS, the complaint noted the requirements set forth in Maryland Code, §§ 5–702 through 5–706 of the Family Law Article and in implementing regulations of the Department of Human Resources that require DSS to make a thorough investigation of reports of child abuse and to render appropriate service in the best interest of the child. It alleged that those statutory and regulatory obligations were the basis of a duty that DSS owed to Collin, "because as a child in a home where suspected abuse had been reported he was a member of the class specifically protected by law." DSS knew, the complaint said, from the reports by Horridge and the neighbor and from their own observations, that Fairris and Fowkes were harming Collin and that it was reasonably foreseeable that the abuse would continue. It breached its duty to Collin by (1) failing to protect him from known abuse, (2) failing to investigate reports of abuse properly and in compliance with statutory, administrative, and professional standards, (3) failing to provide services and follow-up monitoring after the initial home visit to minimize the risk of retaliatory abuse, (4) failing to properly investigate reports of abuse of Collin made after DSS had closed the case, and (5) failing to competently hire, train, and supervise Walsh and Shirey.

Count II charged DSS with negligence based on a special relationship with Collin. It averred that DSS knew that Collin faced a special danger of abuse and it had "specifically proclaimed by word and deed its intention to protect him against that danger," that, having undertaken to do so, it "acquired an affirmative duty to do so in a reasonably competent fashion," and, for the reasons noted in Count I, failed to carry out that duty. Counts III and IV charged Walsh and Shirey with gross negligence—with breaching their statutory

and common law special relationship duties to Collin willfully, wantonly, and with reckless disregard of Collin's rights.

With an extreme paucity of supporting facts, Count V charged DSS with negligence in selecting, retaining, and supervising Walsh and Shirey. Apart from the allegations already noted, going to their negligence in pursuing the reports of abuse, Count V states only that DSS "knew or should have known by the exercise of diligence and reasonable care that Defendant[s] Shirey and Walsh were capable of inflicting harm upon Collin" and that it "failed to use proper care in selecting, supervising or retaining [them]." There are no averments regarding the professional qualifications of Shirey and Walsh, other than that they are licensed social workers; nor did Horridge allege the nature of any deficient supervision of them or how their selection and retention as employees was negligent.

Counts VI and VII attempted to plead State Constitutional torts—a violation of Articles 19 and 24 of the Maryland Declaration of Rights. The theory of those Counts was that Collin had a Constitutionally protected property and liberty interest in the protection afforded him by the statutory and regulatory requirements previously noted and thus had a legitimate entitlement to receive the protective services mandated by those requirements—proper monitoring and supervision of his home, access to the courts for protection, truthful and accurate reporting of abuse to interested persons, and proper investigation of reported child abuse—all of which were denied him by the defendants, who were State actors. Count VIII charged DSS and the two social workers with intentionally inflicting emotional distress upon Collin by their "callous indifference" in refusing to take appropriate action in light of the reports they had received.

With respect to these eight counts, Horridge was apparently suing as the personal representative of Collin's estate, to recover for the tortious conduct committed against Collin. In Count IX, Horridge sued on his own behalf for the wrongful

death of Collin. He incorporated into that count all of the allegations previously pled.

In this appeal, Horridge has abandoned all but Counts I, II, and V—the negligence actions against the State (DSS). He urges that DSS *did* have a duty to protect Collin, once it received a credible report that the child was being abused, that the Circuit Court erred in deciding proximate cause on a motion to dismiss, and that the allegations of negligent supervision were sufficient to state a cause of action.

## DISCUSSION

### Negligent Supervision

■ In *Norfolk & Western Railroad Co. v. Hoover,* 79 Md. 253, 262, 29 A. 994, 995 (1894), we concluded that an employer owes a duty *to its employees* to use "reasonable care and caution in the selection of competent fellow servants, and in the retention in his service of none but those who are," and that, if the employer fails in that duty and "an injury is occasioned by the negligence of an incompetent or careless servant," the employer is liable *to the injured employee* "not for the mere negligent act or omission of the incompetent or careless servant, but for his own negligence in not discharging his own duty towards the injured servant." In *Evans v. Morsell,* 284 Md. 160, 166–67, 395 A.2d 480, 483–84 (1978), we extended that duty, and liability, to the public generally—not just to co-employees—at least with respect to the selection of employees who were expected to have contact with the public. We there quoted with approval the pronouncement from *Fleming v. Bronfin,* 80 A.2d 915, 917 (D.C.1951):

> "One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought

about by the willful act of the employee beyond the scope of his employment."

*Evans, supra,* at 166, 395 A.2d at 483.

■ Our own conclusion in *Evans* was that, "[w]here an employee is expected to come into contact with the public . . . it has been held that the employer must make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee. . . . The nature and extent of the inquiry that is needed will naturally vary with the circumstances." *Id.* at 166–67, 395 A.2d at 484. There is a rebuttable presumption that an employer has used due care in hiring the employee. *Id.* at 165, 395 A.2d at 483, citing *Norfolk & Western Railroad Co., supra,* 79 Md. at 263, 29 A. at 996. *See also Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 501 A.2d 35 (1985); *Henley v. Prince George's County,* 305 Md. 320, 503 A.2d 1333 (1986).

We have already recounted the allegations in the amended complaint in support of the negligent selection, training, and retention count. They are woefully inadequate to state a cause of action. There are no allegations that Shirey and Walsh were professionally or personally unqualified for the positions they held or that, if they *were* unqualified, DSS was or should have been aware of that fact. The only averment in that regard is that they were licensed social workers which, if anything, suggests that they were at least professionally qualified. There are no allegations that they had acted in an incompetent or unprofessional manner previously or that, if they *had* done so, DSS was or should have been aware of it. There are no allegations, other than bald, conclusory statements, that they were improperly trained or improperly supervised.

■ In *Scott v. Jenkins,* 345 Md. 21, 28, 690 A.2d 1000, 1003 (1997), we pointed out that, although we had abandoned the formalities of common law pleading, our Rules do require a pleading to "allege facts, if proven true, sufficient to support each and every element of the asserted claim." Maryland

Rule 2–303(b) requires a pleading to contain "such statements of fact as may be necessary to show the pleader's entitlement to relief or ground of defense." We confirmed in *Scott* that, in a negligence action, a complaint must "allege, with certainty and definiteness, facts and circumstances sufficient to set forth (a) a *duty* owed by the defendant to the plaintiff, (b) a *breach* of that duty and (c) injury *proximately* resulting from that breach." *Id.* at 28, 690 A.2d at 1003, quoting from *Read Drug & Chemical Co. v. Colwill Constr. Co.*, 250 Md. 406, 412, 243 A.2d 548, 553 (1968). Merely stating that a duty existed, or that it was breached, or that the breach caused the injury does not suffice, and that is all that appears in the complaint with respect to Count V. That count was properly dismissed.

### *Negligence: Duty*

■ As noted, the actions against Shirey and Walsh personally, based on allegations of gross negligence, are not pursued in this appeal. Because the St. Mary's County DSS is a State agency and Shirey and Walsh are State personnel (*see Walker v. Human Resources*, 379 Md. 407, 842 A.2d 53 (2004)), any action for simple negligence is properly brought against the State under the State Tort Claims Act (Maryland Code, title 12, subtitle 1 of the State Government Article).

■ The elements of a cause of action in negligence are well-established. To state a claim, the plaintiff must allege facts demonstrating "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18, 26 (2003), quoting from *Muthukumarana v. Montgomery Co.*, *supra*, 370 Md. at 486, 805 A.2d at 395. As noted in *Remsburg*, 376 Md. at 582, 831 A.2d at 26, we have adopted Prosser and Keeton's characterization of "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another," and, in determining whether a duty exists, have considered such things as,

"the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Id.* at 583, 831 A.2d at 26, quoting from *Ashburn v. Anne Arundel Co.*, 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986), quoting, in turn, from *Tarasoff v. Regents of Univ. of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976). In *Jacques v. First Nat'l Bank*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986), we consolidated some of that into two considerations: "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *See also Bobo v. State*, 346 Md. 706, 714–15, 697 A.2d 1371, 1375–76 (1997).

As a general proposition, "a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship." *Scott v. Watson*, 278 Md. 160, 166, 359 A.2d 548, 552 (1976); *Valentine v. On Target*, 353 Md. 544, 551–52, 727 A.2d 947, 950 (1999). Horridge has pled both—a duty imposed by statute (Count I) and a duty imposed by virtue of a special relationship (Count II), but we need deal only with the statutory context pled in Count I.

The relevant statutes are those contained in title 5, subtitle 7 of the Family Law Article (FL), §§ 5–701 through 5–714. In the law itself, the Legislature declared that the purpose of that subtitle, captioned "Child Abuse and Neglect," was "to protect children who have been the subject of abuse or neglect by: (1) mandating the reporting of any suspected abuse or neglect; (2) giving immunity to any individual who reports, in good faith, a suspected incident of abuse or neglect; (3) requiring prompt investigation of *each reported suspected*

*incident* of abuse or neglect; (4) causing immediate, cooperative efforts by the responsible agencies *on behalf of children who have been the subject of reports of abuse or neglect;* and (5) requiring each local department [of social services] to give the appropriate service in the best interest of *the abused or neglected child."* (Emphasis added). FL § 5–702.

To achieve that purpose, FL §§ 5–704 and 5–705 require anyone who has reason to believe that a child has been subjected to abuse or neglect to notify either DSS or the appropriate law enforcement agency. The report may be oral or in writing and, insofar as reasonably possible, it must include the name, age, and home address of the child, the name and home address of the child's parent or other person responsible for the child, the whereabouts of the child, the nature and extent of the abuse or neglect, and any other information that would help determine the cause of the abuse or neglect and the identity of the person responsible for it. *See* FL §§ 5–704(c) and 5–705(d). The report, in other words, must be specific, so that the recipient can identify and locate the child and have some basis for launching an investigation. To encourage persons to make these reports, § 5–708 provides immunity from both civil liability and criminal penalty for any person who makes or participates in making such a report.

As noted, § 5–706 requires DSS to respond to a report of abuse. Section 5–706(a) provides, in relevant part, that "[p]romptly after receiving a report of suspected abuse or neglect ... the local department or the appropriate law enforcement agency, or both, if jointly agreed on, shall make a thorough investigation of a report of suspected abuse to protect the health, safety, and welfare *of the child or children."* [1] (Emphasis added). Section 5–706(b) requires DSS, "[w]ithin 24 hours after receiving a report of suspected physi-

---

1. In this case, that duty would fall on DSS, as it was the recipient of the reports. As noted below, upon receipt of a report of suspected child abuse, DSS is required by regulation of the Department of Human Resources to notify the local law enforcement agency "immediately," at which point the two agencies can agree on their respective roles in the investigation.

cal or sexual abuse," to "(1) see the child; (2) attempt to have an on-site interview with the child's caretaker; (3) decide on the safety of the child, wherever the child is, and of other children in the household; and (4) decide on the safety of other children in the care or custody of the alleged abuser." The investigation must include "a determination of the nature, extent, and cause of the abuse" and, if abuse is verified, a determination of the identity of the persons responsible for it, a determination of the name, age, and condition of any other child in the household, an evaluation of the parents and the home environment, and a determination of any other pertinent facts and any needed services. FL § 5–706(c).

To the extent possible, the investigation must be completed within ten days after receipt of the first notice of the suspected abuse. Within that 10–day period, DSS must make a preliminary report of its findings to the local State's Attorney, and, within five business days after completion of the investigation, it must make a "complete written report of its findings" to the State's Attorney. *See* FL § 5–706(g), (h), and (i). Based on its findings and any treatment plan, DSS is required to "render the appropriate services in the best interests *of the child*, including, when indicated, petitioning the juvenile court on behalf *of the child* for appropriate relief, including the added protection *to the child* that either commitment or custody would provide." (Emphasis added). FL § 5–710. These statutory requirements are supplemented by regulations adopted by the Department of Human Resources. COMAR 07.02.07.05 requires DSS to establish a process for ensuring that a report of suspected child abuse from any source is *immediately* directed to its child protective service unit. It requires DSS to have staff on call 24 hours a day, seven days a week, to "receive and take appropriate action on reports of suspected child abuse" and to ensure that the public has "a means of access to staff who are on-call after normal office hours." Upon receipt of a report of suspected child abuse, DSS must "[i]mmediately notify the local law enforcement agency." Only if the reported incident "does not meet the definition of child abuse or neglect defined in Regulation

.02B of this chapter" may DSS decline to initiate an investigation. COMAR 07.02.07.05E.[2]

As noted, the statute requires a report to contain certain specific information, and that is provided for as well in the regulations (COMAR 07.02.07.04D). If the report is deficient in that regard, COMAR 07.02.07.06 requires DSS to attempt to obtain the missing information from the reporting source. Thus, to the extent that any of the eight reports of abuse made by Horridge failed to contain relevant information, DSS was obliged to make inquiry of him to obtain that information.

The regulations concerning the investigation and any ensuing action are quite detailed and need not all be repeated. At least two more are particularly relevant, however. COMAR 07.02.07.07A requires DSS, during an investigation, to gather appropriate information to assess immediate safety and risk of maltreatment of children in the household, determine whether child abuse is "indicated, unsubstantiated, or ruled out," determine whether "maltreatment, other than that initially reported, is indicated, unsubstantiated, or ruled out," "determine what services, if any, are appropriate," and determine if DSS should initiate shelter care or file a Child in Need of Assistance petition. COMAR 07.02.07.08, in conformance with FL § 5–706(b), requires DSS (or, by joint agreement between DSS and a law enforcement agency, a law enforcement officer) to initiate an on-site investigation, "see the alleged victim and determine if the health, safety, and well-being of the alleged victim require that the child be removed," and take certain other designated action.

The defense that is usually raised by social service agencies in cases such as this, and the defense raised by DSS in this case, is what has become known as the "public duty doctrine,"

---

**2.** There is no question in this case that Horridge's complaint alleges reports of conduct that would qualify as child abuse under COMAR 07.02.07.02B(7), which defines the term to include "[p]hysical injury, not necessarily visible ... under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed."

*i.e.,* "when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." *Muthukumarana v. Montgomery County, supra,* 370 Md. at 486, 805 A.2d at 395, quoting from DAN B. DOBBS, THE LAW OF TORTS § 271 (2000). *See also Williams v. Baltimore,* 359 Md. 101, 753 A.2d 41 (2000). Relying on *Muthukumarana, Willow Tree v. Prince George's County,* 85 Md.App. 508, 584 A.2d 157 (1991), and *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985), DSS urges that, "[a]bsent an express intent by the Legislature to create such a duty, there was no duty owed to Collin individually." Any contrary ruling, it fears, would make DSS a "guarantor of a particular child's safety." As have other courts around the country, we reject that argument. The cases cited are not on point; the Legislature, in our view, *has* created a duty flowing to children specifically identified to DSS as being the subject of suspected abuse, and recognition of that duty would not make DSS a guarantor of the safety of those children or any other.

We recognized in *Muthukumarana* that the "public duty" doctrine "has no application when the court concludes that a statute or court order has created a special duty or specific obligation to a particular class of persons rather than to the public at large." 370 Md. at 487, 805 A.2d at 396, quoting from DAN D. DOBBS, *supra,* § 271. That case dealt with whether 911 operators and supervisors were liable in tort for negligence in failing to respond properly to emergency calls. We concluded that their duty was to the public at large, not to anyone in particular, and that, unless it could be shown that the 911 employee "affirmatively acted to protect or assist the specific individual, or a specific group of individuals like the individual in need of assistance," thereby inducing a specific reliance, no tort duty existed. *Id.* at 496, 805 A.2d at 401. In large part, that conclusion was based on the often imprecise or unclear information given to the 911 operators, upon which they must act instantaneously. *Id.* at 491, 805 A.2d at 398. That is less of a problem with respect to reports of child abuse. For one thing, if the report is unclear or incomplete,

as it often may be, DSS has a regulatory duty to clarify the information. More important, it is usually dealing with reports of abuse that have already occurred, and it has 24 hours to deal with the report; the report of an on-going incident of abuse, that needs a more immediate response, is more likely to go to 911 or a police agency.

*Willow Tree v. Prince George's County, supra,* 85 Md.App. 508, 584 A.2d 157, dealt with whether a county that had established general safety regulations for day care centers could be held liable to the parents of a child who was killed while using playground equipment that was allegedly unsafe and in violation of the safety regulations. The Court of Special Appeals concluded that there was no special duty on the part of the State to the child, merely from the adoption of safety regulations. That is a far cry from what we have here, which is true as well with *Lamb v. Hopkins, supra,* 303 Md. 236, 492 A.2d 1297. The question there was whether probation officers who failed to seek the revocation of probation of an individual though aware that the individual had committed a number of drunk driving offenses during the probationary period, was liable in tort to the parents of a child severely injured by the probationer while driving intoxicated. The theory of asserted liability was that the defendants, having taken charge of the probationer, had a special duty under the principles enunciated in §§ 314–319 of the *Restatement (Second) or Torts* (1965) to prevent that person from harming others and that it had a statutory duty to report violations to the court. The statutory duty, we held, was to the court, not to anyone else.[3]

---

3. DSS also seeks support from three out-of-State cases—*Marshall v. Montgomery County Children Servs. Bd.,* 92 Ohio St.3d 348, 750 N.E.2d 549 (2001), *Beebe v. Fraktman,* 22 Kan.App.2d 493, 921 P.2d 216 (1996), and *Nelson v. Freeman,* 537 F.Supp. 602 (W.D.Mo.1982), aff'd, 706 F.2d 276 (8th Cir.1983)—which are either inapposite or simply not persuasive.

In *Marshall,* the county and its DSS equivalent were sued by the paternal aunt of a child, Davon, who was beaten to death by his mother. DSS was aware that the mother was a substance abuser and had abused other children, whom they had removed from her care

The duties imposed on DSS by FL § 5–706 and the implementing regulations of the Department of Human Resources are far more specific and focused. They require a prompt investigation of *each* reported incident of child abuse. The duty to act is mandatory; the steps to be taken are clearly delineated; and, most important, the statute makes clear in several places that the sole and specific objective of the requirement is the protection of a specific class of children—those identified in or identifiable from specific reports made to

prior to Davon's birth. After Davon was born, DSS received no report of abuse as to him. The only call was from Davon's father, who asked that DSS check on the child due to the mother's substance abuse. In response, a social worker went to the home on four occasions but found no one present. On a fifth occasion, the social worker made contact, went to the home, found the home clean and no indication of abuse, and therefore closed the case. DSS received no further report until the day that Davon was killed. That, of course, is a far different situation from the one now before us. Apart from that factual distinction, the court, in holding that there was no liability, relied on an Ohio statute stating that a political subdivision is liable for injury or death only when liability "is expressly imposed upon the political subdivision by a section of the Revised Code" and that liability "shall not be construed to exist ... merely because a responsibility is imposed upon a political subdivision." *Marshall*, 750 N.E.2d at 553. Maryland has no such statute.

The Kansas court in *Beebe* found no special duty by merely taking a report of possible child abuse and promising to follow up on that report. The Kansas statute was nothing close to FL § 5–706, however. It provided that, upon receipt of information that a child appeared to be in need of care, the agency "shall make a preliminary inquiry to determine whether the interests of the child require further action be taken" and, if reasonable grounds were found to believe that abuse or neglect existed, the agency was to take immediate steps to protect the child. The agency received two reports of possible abuse, made a preliminary inquiry after each report, and determined that no further action was necessary. The court regarded any further investigation as a discretionary call and not "subject of hindsight scrutiny." *Beebe*, 921 P.2d at 218.

*Nelson v. Freeman* was a diversity case in which one Federal District Court judge postulated what the law of Missouri might be in the absence of any clear precedent. The case is not persuasive. Indeed, in *Turner v. District of Columbia, infra*, 532 A.2d 662, 671 (D.C.1987), the District of Columbia court expressly declined to follow *Nelson*, both because it found the case distinguishable and because "[w]e are also influenced by the rather narrow holding of the Eighth Circuit and by its less than ardent endorsement of the trial court's interpretation of state law."

DSS and those also found in the home or in the care or custody of the alleged abuser. This is not an obligation that runs to everyone in general and no one in particular. It runs to an identified or identifiable child or discrete group of children.

Most every other court that has considered this issue in the context of similarly worded statutes or regulations has arrived at that conclusion. In *Brodie v. Summit Cty. Children Servs. Bd.*, 51 Ohio St.3d 112, 554 N.E.2d 1301 (1990), the Ohio equivalent of DSS, sued for, failure to investigate reports of child abuse inflicted on an identified victim, raised the defense that the statutory obligation, similar to that embodied in FL § 5–706, ran to the public generally and did not create any duty to protect the specific child. The court rejected that defense:

"We conclude that in view of the General Assembly's express intent that children services agencies take responsibility for investigating and proceeding with appropriate action to prevent further child abuse or neglect in specific, individual cases, the public duty doctrine does not apply as a defense against an allegation that a particular child did not receive the benefit of their action as a result of the agency's negligence. We hold that a children services board and its agents have a duty to investigate and report their findings as required by [the Ohio equivalent to FL § 5–706] when a specific child is identified as abused or neglected, and the public duty doctrine may not be raised as a defense for agency failure to comply with such statutory requirements."

*Id.* at 1308.

The District of Columbia Court of Appeals reached the same result, for the same reason, in *Turner v. District of Columbia, supra*, 532 A.2d 662 (D.C.1987). As in this case, the DSS equivalent was sued for failure to respond to a report of child abuse. Rejecting the "public duty" defense, the court observed:

"The Child Abuse Prevention Act imposes upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise help-

less class of persons: abused and neglected children. When CPS [DSS] employees are negligent in carrying out these responsibilities, that statutorily protected class suffers in a way uniquely different from the public at large."

*Id.* at 668.

Noting that the question was whether, in that circumstance, a special relationship or special duty was created, the court relied on *Mammo v. State*, 138 Ariz. 528, 675 P.2d 1347 (App.1983) and *Florida First National Bank v. City of Jacksonville*, 310 So.2d 19 (Fla.App.1975) as "consistent with others throughout the country, holding that if a state agency is required by statute or regulation to take a particular action for the benefit of a particular class and fails to do so, or negligently does so, and the plaintiffs justifiably rely to their detriment on the agency's duty to act, a cause of action in negligence will lie against the state or its agency." *Turner*, 532 A.2d at 672.

In *Jensen v. Anderson County DSS*, 304 S.C. 195, 403 S.E.2d 615 (1991), the court concluded that the South Carolina equivalent of FL § 5–706 "imposes a special duty on the local child protection agency and its social workers to investigate and intervene in cases where child abuse has been reported." *Id.* at 619. In reaching that conclusion, the court applied a six-part test to determine when a statutory special relationship exists: (1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute, directly or indirectly, imposes on a specific public official a duty to guard against or not cause that harm; (3) the class of persons the statute intends to protect is identifiable before the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know the likelihood of harm to members of the class if he/she fails to do his/her duty; and (6) the officer is given sufficient authority to act in the circumstances or undertakes to act in the exercise of his/her office.

*See also Coleman v. Cooper*, 89 N.C.App. 188, 366 S.E.2d 2, 8 (1988); *Tyner v. DSHS, Child Protective Servs.*, 141

Wash.2d 68, 1 P.3d 1148 (2000); *M.W. v. DSHS*, 149 Wash.2d 589, 70 P.3d 954, 957 (2003); *Owens v. Garfield*, 784 P.2d 1187, 1192 (Utah 1989); *Dept. of Health & Rehab. Servs. v. Yamuni*, 529 So.2d 258, 261–62 (Fla.1988); *Alejo v. City of Alhambra*, 75 Cal.App.4th 1180, 89 Cal.Rptr.2d 768 (2000); Susan Lynn Abbott, *Liability of the State and Its Employees for the Negligent Investigation of Child Abuse Reports*, 10 Alaska L.Rev. 401, 405 (1993).

It is not necessary to adopt precisely the six-part test enunciated by the South Carolina court in *Jensen*, although the elements of that test are analytically relevant and consistent with the considerations we noted in *Ashburn v. Anne Arundel County, supra*, 306 Md. 617, 627, 510 A.2d 1078, 1083, and *Remsburg v. Montgomery, supra*, 376 Md. 568, 583, 831 A.2d 18, 26. Clearly, the essential purpose of the statutory duties created by FL § 5–706 and the implementing regulations of the Department of Human Resources was to protect a specific class of children, identified or identifiable before the fact from statutorily mandated reports, from a specific kind of harm likely to occur if the statutory duty is ignored. DSS is given not just a specific duty to act in response to such a report but ample and detailed authority to do so.

In a *Remsburg* analysis, the foreseeability of harm arising from a failure to comply with the statutory and regulatory requirements is clear. The Department of Human Resources' own statistics show that, in FY 2003, there were nearly 7,300 cases in Maryland in which there was an "indicated" finding of physical, mental, or sexual abuse or neglect of a child. Even more alarming, and relevant, is the most current report of the National Clearinghouse on Child Abuse and Neglect Information, a unit of the U.S. Department of Health and Human Services, which shows that, in CY 2002, approximately 1,400 children in the United States died of abuse or neglect, and that 76% of those fatalities involved children younger than four years of age. (*See* "statistical information" on the National Clearinghouse on Child Abuse and Neglect Information website at *www.nccanch.acf.hhs.gov*). The foreseeability of harm from agency inaction, once a facially reliable report of

abuse is made, may serve to establish as well the "close connection" between the negligent conduct and the injury ultimately suffered.

The legislative policy of preventing future harm to children already reported to have been abused is so abundantly clear as to be beyond cavil, and, given the statutory mandate to act and the general waiver of tort immunity when State employees fail to act in a reasonable way and harm ensues, we can see no great burden or consequence to regarding this existing statutory duty as a civil one from which tort liability may arise. We cannot conceive that the Legislature intended, when a child is killed or injured, at least in part because DSS fails to perform the duties clearly cast upon it to make a site visit within 24 hours and a thorough investigation, for the only sanction to be the placement of a reprimand in some social worker's personnel file. The Legislature meant for DSS and its social workers to act immediately and aggressively when specific reports of abuse or neglect are made, and the best way to assure that is done is to find that they *do* have a special relationship with specific children identified in or, upon reasonable effort, identifiable from, facially reliable reports of abuse or neglect and, subject to the State Tort Claims Act, to make them liable if harm occurs because they fail in their mandated duty. The Circuit Court erred in finding, on the allegations of the amended complaint, that no duty, cognizable under Maryland tort law, existed.

### Proximate Cause

As an alternative ground for dismissing the amended complaint, the Circuit Court concluded that, as any negligence on DSS's part was passive in nature and that the "moving and effective cause" of Collin's death was the "active negligence [of his mother or her boyfriend] in beating Collin to death," the DSS negligence was not the proximate cause of the injury. In so holding, the court misconstrued the nature of proximate cause in a case such as this one. Where the actionable duty is to protect another from harm, proximate

cause must be judged in terms of the foreseeability of such harm being inflicted.

The Restatement (Second) of Torts addresses this issue in several sections. Section 442A makes clear that, "[w]here the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause." Comment b. to that section notes:

"Where the negligence of the actor has created the risk of harm to another because of the likelihood of such intervention, the actor is not relieved of responsibility merely because the risk which he has created has in fact been fulfilled. The same is true where there is already some existing risk or possibility of the intervention, but the negligence of the actor has increased the risk of such intervention, or of harm if it occurs."

Section 447, dealing with the negligence of intervening acts, provides, in relevant part, that the fact that an intervening act of a third person is negligent does not make it a superseding cause of harm to another "which the actor's negligent conduct is a substantial factor in bringing about, if ... the actor at the time of his negligent conduct should have realized that a third person might so act...." Finally, and most directly to the point, § 449 states:

"If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."

Comment b. to that section explains:

"The happening of the very event the likelihood of which makes the actor's conduct negligent and so subjects the actor to liability cannot relieve him from liability. The duty to refrain from the act committed or to do the act omitted is imposed to protect the other from this very danger. To deny recovery because the other's exposure to the very risk

from which it was the purpose of the duty to protect him resulted in harm to him, would be to deprive the other of all protection and to make the duty a nullity."

In *Scott v. Watson, supra,* 278 Md. 160, 359 A.2d 548, we adopted that approach in a generally analogous setting. Responding to certified questions from the U.S. District Court, we concluded that, although a landlord of an urban apartment complex had no common law special duty to its tenants to protect them from the criminal acts of third parties committed in the common areas within the landlord's control, if the landlord knew or should have known of criminal activity against persons or property in the common areas, it had a duty to take reasonable measures, in view of the circumstances, to eliminate the conditions contributing to the criminal activity. We observed that a breach of that duty, alone, was not conclusive of actionable negligence, however—that proximate causation was also an element.

In that regard, we noted a split of authority as to whether, when such a duty was found, the landlord's negligence constituted a proximate cause of a tenant's injury at the hands of a third person's criminal conduct. We decided to follow the approach of § 448 of the Restatement (Second) of Torts and concluded that "[a] breach of duty by the defendant would result in his liability in the third party criminal activity context only if the breach enhanced the likelihood of the particular criminal activity which occurred." *Id.* at 173, 359 A.2d at 556. This "enhanced risk" theory, which underlies §§ 442A, 447, and 449 of the Restatement as well, we held to be "a fair solution of the causation problem in this context." *Id.* We confirm that view. The amended complaint sufficed to allege that the negligence of DSS and its social workers was a proximate cause of the injury ultimately inflicted on Collin by Fairris or Fowkes.

### Caveat

In holding that the Circuit Court erred in dismissing the complaint on the ground that no actionable duty existed on the part of DSS or that any negligence on its part was not a

proximate cause of Collin's injury and death, we do not suggest that DSS is, in fact, liable in this case. Mr. Horridge will have to produce sufficient evidence to show that DSS negligently failed to comply with the applicable statutory and regulatory requirements. As part of that burden, he will have to establish that the investigation conducted was, indeed, negligently deficient or that, given the facts that a proper investigation revealed or would have revealed, DSS negligently failed to take action demanded by the circumstances. He will have to show, as well, that the injury suffered by Collin was a foreseeable consequence of the failure by DSS to perform its statutory obligations. The fact that a dreadful result ensued does not, of itself, mean that DSS failed in its duty.

JUDGMENT OF CIRCUIT COURT REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS ON COUNT I OF THE AMENDED COMPLAINT; COSTS TO BE PAID BY APPELLEE, ST. MARY'S COUNTY DEPARTMENT OF SOCIAL SERVICES.

CATHELL and BATTAGLIA, JJ., Dissent.

Dissenting opinion by CATHELL, J. which BATTAGLIA, J., joins.

I dissent. This is a tragic case. And it is not an isolated case. With the numbers of interactions between the Departments of Social Services and children these types of very tragic cases are repeated more often then any of us believe is acceptable. One is too many. We all know, however, that there will be more than one. But the actions of the Departments of Social Services are not the cause of these tragedies. The cause goes much deeper than the administrative oversight over these cases.

The Department does not make parents kill their children. I do not know what in society is creating the conditions that seem to be causing the increasing levels of infanticide, but I have no hesitation in saying that the Department of Social

Services is not the causative factor. Thus, in my view, the action taken by the majority in this case, in addition to being legally wrong, will have little, if any, effect in reducing the instances of infanticide or even the killing of older children. Its main direct effect will be to create a bonanza for trial attorneys, while its collateral effect will be to create high levels of confusion among the ranks of personnel in the numerous administrative agencies in Maryland with respect to the use of the discretion they are charged with exercising.

With that said, this case, in addition to being tragic, is, in a legal sense, also a hard case. And there is an old saying that "hard cases it is said make hard law." The majority creates today the template for tens of thousands of lawsuits that heretofore did not exist. For the first time in the history of this State, an employee of the State who does not commit an affirmative act placing a victim in danger and who investigates the matter prior to the injury to the victim and makes a discretionary determination that no further action is needed, but is mistaken and the subject of the investigation is later injured, now creates liability for himself or herself and for the State.

The majority's holding cannot be logically limited to the factual parameters of this case—the death of a child. The majority's reasoning does not, and cannot, logically limit the applications it now creates, by the result of the mistake in the exercise of the social worker's discretion, *i.e.*, that it will only apply if the injury to the child exceeds a certain level. Duty, if it exists, is not determined by the degree of injury. Once the duty is created, as the majority today creates it, a breach of that duty will be actionable if any injury occurs. The cause of action the majority creates today will apply equally to an estranged spouse alleging to the Department that the custodial spouse is "spanking" the child too hard, and therefore abusing the child. The Department, in order to protect itself from litigation, will have to remove the child if bruising appears because of the fear that some fact-finder, a judge or a jury, (some of which may share a completely different parenting philosophy) will consider the bruising to be abuse. And,

even if it initially determines that it does not constitute abuse, when the estranged parent calls again and reports that spanking is continuing and it is now too severe, the Department will have to initiate a new inspection—every time there is another allegation.

Moreover, with the majority's decision, virtually every discretionary action of every employee of any administrative agency, whose employees by statute are required to perform discretionary functions, will now subject the State to civil suits where none existed before.

Factually, this is not a case where the respective employee failed to investigate (although they did not do so promptly). Prior to the injuries complained of here, the employees investigated and made a discretionary decision. It turned out to be wrong—tragically wrong.

It is accurate to note, as the majority does, that the estranged father continued to make allegations of abuse. But, any trial judge, or for that matter, any person familiar with what happens in divorce and domestic situations where parents are fighting over children, knows that it is not at all unusual for one parent to continue to accuse the other of abuse or improper actions toward the children. With the majority's decision today, in such cases where one parent is continually complaining about the other parent's treatment of children (and such complaints are not at all unusual in the real world where people live), the Department will virtually have to assign an investigator to maintain a perpetual investigation as to every such situation. Or the Department may choose an easier course to protect itself by taking the child away from the custodial parent upon the first report of suspected abuse and thereby protecting the State, and its employees, from lawsuits of the nature the majority authorizes today.

This Court has never before authorized this type of suit against the State, based upon a "special relationship" arising from a statute of this type. And the majority does not argue to the contrary. The majority mentions several cases in its discussion of the special relationship/negligence issue. The

first case is *Remsburg v. Montgomery,* 376 Md. 568, 831 A.2d 18 (2003). The majority uses *Remsburg* for its statement in respect to duty, that *Remsburg* in turn quoted from *Muthuku-marana v. Montgomery,* 370 Md. 447, 805 A.2d 372 (2002), and goes on to use the language of those two cases to state the general Maryland standard for the creation of duties out of which negligence cases can arise. Then the majority does not follow that standard.

*Remsburg* was a case where it was alleged that the leader of a hunting party had, in part because of the existence of statutes regulating hunting, a duty to protect a person acci-dentally shot by his son. Admittedly, none of the statutes mentioned were as specific as the statute in the case at bar. Nonetheless, this Court found no duty arising out of those statutes that would support an action in negligence against the father for the actions of the son.

*Muthukumarana* was actually two cases involving allega-tions that 911 operators had duties arising out of statutes that created actionable negligence causes of action if the operators made errors resulting in injury to others. This Court found no actionable negligence against the operators who had, in one instance, made mistakes in furnishing information to respond-ing officers, the result of which was a death. We have recently described our holding in *Muthukumarana* (and *Fried v. Archer,* its companion case) in the case of *Patton v. USA Rugby,* 381 Md. 627, 851 A.2d 566 (2004).

The position the majority takes today, is, in my view, in direct conflict with this Court's decision in *Muthukumarana,* where we specifically held, as we just described it in *Patton,* that System 911 operators, in spite of their specific functions to provide protective assistance to emergency callers, had to have "acted affirmatively to protect," in order for a duty to exist out of which an action in negligence could arise.

I see little difference, if any difference, in the 911 operators' cases and the present case and I do not believe that the present case can be logically reconciled. The question will now arise: Are this Court's cases, previously mentioned and

the earlier cases I shall mention later, now overruled? If so, does the majority really understand that they are overruling the prior cases? If they are not overruling the prior cases, what will happen when a lawyer for a client is advising the client on what the law is in respect to "special relationships?" Does he or she follow the prior line of cases because they have not been specifically overruled, or the latest—the present case? Or, does he or she flip a coin? I simply do not believe that the present case, and the 911 operators' cases, and some of the prior cases I have and will mention, can compatibly coexist as the law of Maryland.

In *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986), this Court found no negligence where a police officer told an intoxicated person to discontinue driving and that person, after the officer had left, began to drive again and hit and injured a pedestrian, basing the decision in part on the fact that the police officer there involved had not taken any affirmative action in directing the driver to do what later resulted in serious injuries or death to another. In the present case, the agency employees acted, exercised discretion, albeit poorly, and then failed to take other affirmative action—they failed to act further. They did not direct anyone to do anything that resulted in injury and death to the child. As in *Ashburn*, no act of commission occurred in the case *sub judice*, yet the majority departs from the holding of *Ashburn* to create a new cause of action.

*Jacques v. First National Bank*, 307 Md. 527, 515 A.2d 756 (1986), did not involve a governmental defendant. It was a private action for negligence against a private defendant.

In *Bobo v. State*, 346 Md. 706, 697 A.2d 1371 (1997), another case cited by the majority, this Court found no duty on the part of the Clerk of the District Court to issue a recall of a warrant. One of the averments in that suit was that the clerk " 'breached his duty as Court Clerk to perform the tasks set forth by the State as the correct procedure to be followed in the performance of tasks of Court Clerks. . . .' " *Id.* at 710, 697 A.2d at 1373. *Valentine v. On Target*, 353 Md. 544, 727

A.2d 947 (1999) was an action against a private party in which, for several reasons, no negligence was found (there was no statute involved in the case).

The majority next cites to *Williams v. Baltimore*, 359 Md. 101, 753 A.2d 41 (2000). Amongst other claims, the plaintiffs in *Williams* argued that two different statutory provisions created duties out of which special relationships arose. The statute there involved, stated, in relevant part, "[a] local law enforcement officer responding to the request for assistance shall: (1) Protect the complainant from harm when responding to the request. . . ." *Id.* at 124, 753 A.2d at 53. It contained several other provisions requiring officers to aid complainants in retrieving their belongings. We did a lengthy review of the legislative history of that statute before limiting its scope to imposing very specific and limited obligations upon the responding police officers. However, in its language that statute was every bit as specific, if not more so, than the statute the majority today holds creates an unlimited (the social services workers had made an investigation and exercised discretion) duty upon social services workers to reinvestigate, seemingly *ad infinitum*, whenever a parent is dissatisfied with the prior investigation. More important, the majority in this case holds that, even in the absence of an affirmative act, such a statute generates a duty out of which actionable negligence actions can arise when criminal acts are subsequently committed by others. This is EXACTLY what the Court said in *Williams* could NOT create actionable negligence. In *Williams*, we specifically declined to impose such a duty based upon a statute no less protective than the one in the case at bar. We stated in that context:

"As we have said, it is clear that the intent of the Legislature in enacting section 798 clearly was not to create a duty to protect the victim for an indefinite amount of time: it was only to provide protection while responding to the request. . . . It is clear from the statute that it is limited to an officer who is responding to a complaint of domestic violence where the violence continues in the officer's presence, and

an officer who is accompanying a person to recover personal effects."

*Id.* at 128–29, 753 A.2d at 55.

We also discussed the General Order that was alleged to have created a special relationship arising out of a statute. The General Order, in relevant part, provided that its purpose was to "[p]rotect the victim of a domestic incident from physical harm." *Id.* at 130, 753 A.2d at 56. That statement is at least as specific as the statute the majority relies on in the case at bar. In addressing the General Order, we stated, in the most relevant part, "[t]o require a law enforcement officer to protect a victim of domestic abuse from all potential future possibilities of domestic assault would be absurd. That could not have been the intention of the police department in drafting this order, and we are not prepared to create such a duty." *Id.* at 130, 753 A.2d at 57. With the case *sub judice,* the Court is now prepared, and is, creating such a duty *in the absence of any affirmative action* on the part of the employees of the Department.

Ultimately, the *Williams* case was remanded because of the police officer's specific affirmative act of commanding the victims to remain in the house because he would be right outside—and then he left, after which they were attacked. We noted in *Williams* that there had been an actual affirmative act, such as we later found lacking in the 911 operators' cases and which is specifically lacking in this case, upon which a special relationship might have been created out of which a duty might have arisen. And it was for that reason, *and no other,* that *Williams* was remanded for the consideration by a fact-finder as to whether that *affirmative act* created a special relationship out of which a duty to protect was created, giving rise to actionable negligence.

The majority summarily dismisses this Court's holding in the case of *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985) (as well it must in order to reach the result it wants to reach). In *Lamb,* a third party argued that because a probation officer had a duty to initiate action to revoke an individu-

al's probation, but took no action, and the individual, while driving drunk, seriously injured a child, the officer's duty created a special relationship out of which a negligence action could arise. We disagreed, primarily on the basis that the duty to initiate revocation was to the court.

In similar fashion, the majority now disposes of the Court of Special Appeals' case of *Willow Tree Learning Center, Inc. v. Prince George's County*, 85 Md.App. 508, 584 A.2d 157 (1991), saying simply that it "dealt with whether a county that had established general safety regulations for day care centers could be held liable to the parents of a child who was killed while using playground equipment that was allegedly unsafe and in violation of safety regulations. The Court of Special Appeals concluded that there was no special duty on the part of the State to the child, merely from the adoption of safety regulations. That, too, is a far cry from what we have here...." The majority opinion's characterization of *Willow Tree*, as "a far cry from what we have here," is completely wrong, because the majority's opinion in this case omits from its discussion the very issue in *Willow Tree* that makes it very relevant to the instant case. In *Willow Tree*, that court, very early in the opinion, discussed one of the main arguments of the plaintiffs: "The Sanders argue that the frayed rope was a violation of applicable safety regulations, and that under Md. Regs.Code title 10, § .05.01.16 ('COMAR') and the Prince George's County Code, a duty was created on the part of the appellees [Prince George's County] to discover and report it." *Id.* at 513–14, 584 A.2d at 160 (alteration added) (footnote omitted).

That court then discussed the statute applicable there, which was similar, in fact, to the one at issue here. It stated:

"The public general statute ... provided that:

. . .

"(b) ... These rules and regulations shall:

(1) Ensure safe and sanitary conditions in group day care centers.

(2) Ensure proper care, protection, and supervision of children...."

*Id.* at 514, 584 A.2d at 160. As can easily be seen, the statute in *Willow Tree* had specific references to the protection of children—such as the statute in the instant case. That court then stated:

"Subsection (2) focuses on children, and reiterates the goal of safety.... The position of the appellants, were we to adopt it, would result in the creation of a duty to inspect for all possible risks, and would effectively make the County and its inspectors liability insurers of day care centers...."

*Id.* at 514, 584 A.2d at 160. While I agree that *Willow Tree* does not support the position the majority now wants to take, it is simply wrong to characterize it as "a far cry from what we have here." In my view, they cannot both simultaneously exist as the law of Maryland.

The majority reads some of the out-of-state cases differently than do I. It is one thing to say that they are not persuasive—it is obvious in any event that they have not persuaded the majority. But you simply cannot make something "a far different situation from the one now before us" merely by saying so. In my view, any objective reader of *Marshall v. Montgomery County Children Servs. Bd.*, 92 Ohio St.3d 348, 750 N.E.2d 549 (2001) and *Beebe v. Fraktman*, 22 Kan.App.2d 493, 921 P.2d 216 (1996), would have to say that those two cases are very similar to the case at bar. In *Marshall*, the social services workers were already aware that the mother was an abuser as to other children. After the child at issue was born, the agency received a call from the child's father (just as in the present case) who, while not reporting actual abuse, asked the agency to investigate the situation. Eventually, the social worker was, after four tries, able to enter the home to investigate and made a finding of no abuse—just as did the social service workers in the present case. They then closed the case, just as did the workers in this case. The child was later killed. The only real difference in *Marshall* is that they received no follow-up calls from the father and the calls

received had not been specific (although they had to have been expressions of concern for the well-being of the child and the workers were already aware of the parent's inclination toward committing violent acts against her children). Factually, then, I suggest that there were many similarities. However, as the majority states, there was a statute that contained express language limiting the ability of subdivisions to be sued based upon other statutes that imposed responsibilities upon subdivisions. In other words, in Ohio there was a statute that said what this State's common law said prior to the Court's opinion in the case *sub judice*. What the statute stated in *Marshall*, the doctrine of *stare decisis* provides in this case, at least until the majority chose to abandon the doctrine.

The Kansas case of *Beebe* is almost exactly on point. It may not persuade the majority but it certainly is not "inapposite."

I accept the majority's position that, to it, *Nelson v. Freeman*, 537 F.Supp. 602 (W.D.Mo.1982), is not persuasive. I wish it were. In fact, I do not see how it is not on point and not persuasive. The Missouri child abuse statute at issue in *Nelson* was similar to the statutes in the present case. It stated, in relevant part, as discussed by the federal district court:

> "The second objective [of the statute] is furthered by requiring the local D.F.S. office to investigate reported cases of child abuse and, if necessary, provide 'protective services' or contact the appropriate law enforcement authority."

*Id.* at 606.

The federal district court then quoted portions of the statute:

"1.  The division shall establish and maintain a telephone service. . . .

2.  The division shall maintain a central registry. . . .

. . .

4. The local office . . . shall cause a thorough investigation to be made immediately or no later than within twenty-four hours [familiar?] . . . the primary purpose of such investigation being the protection of the child. . . .

5. Protective social services shall be provided by the local office . . . to prevent further abuse. . . . "

*Id.* (alteration added).

The court then described the issue, which plaintiffs asserted created an individual duty, as:

"The question presented by the third ground alleged . . . is whether the alleged failure of D.F.S. officials to comply with the statutory duty created by [the statute], in particular the duty to 'cause a thorough investigation to be made' of reported child abuse, states a cause of action in favor of plaintiffs under applicable Missouri tort law. Under Missouri law, 'Before an act is said to be negligent, there must exist a duty to the individual complaining.' Whether a duty was owed by these defendants to these plaintiffs under the facts of this case depends upon whether, *under applicable Missouri law, the Child Abuse reporting statute must be found to have created only a public duty and not a duty to individuals, and whether, under* the allegations of plaintiffs' complaint, plaintiffs could be said to fall within some exception to the general applicable rule in that D.F.S. officials, by their actions, could be said to have established a specific duty to these plaintiffs."

*Id.* at 607 (alterations added) (citation omitted).

The facts alleged in *Nelson* (initially a sexual-abuse case, but one that did result in a death), accepted for the purposes of that court's resolution, included that:

"[D]efendants Keatings and White undertook to investigate some but not all of the hotline calls concerning the aforenamed Nelson children. . . . '[Defendants] fail[ed] to adequately investigate or detect the aforedescribed child abuse and mistreatment . . . failed to adequately investigate the aforedescribed reputations and prior bad acts . . . improper-

ly classifying . . . welfare investigations as unsubstantiated, thereby foreclosing future investigation of the plight of the Nelson children . . . failing to remove the Nelson children from the residence . . . .' "

*Id.* at 604. How much more similar could the allegations in that case be compared to those in this present case? The federal district court in *Nelson,* interestingly, in referring to the seminal Missouri case, noted that it had been based on an old Supreme Court case in respect to conservators of the peace and their duties to individuals, arising out of Maryland. It involved allegations that a Maryland sheriff had not performed his duty to suppress riots, and a citizen had been hurt as a result. That citizen then sued the sheriff on his bond. The Supreme Court of the United States in *South v. Maryland,* 18 How. 396, 59 U.S. 396, 15 L.Ed. 433 (1856), noted:

"[T]he sheriff, being present, the plaintiff, Pottle, applied to him for protection, and requested him to keep the peace of the State of Maryland, he, the said sheriff, having power and authority so to do. That the sheriff neglected and refused to protect and defend the plaintiff, and to keep the peace, wherefore, it is charged, 'the sheriff did not well and truly execute and perform the duties required of him by the laws of said State' . . . . It assumes as a postulate, that every breach or neglect of a public duty subjects the officer to a civil suit by any individual who, in consequence thereof, has suffered loss or injury . . . because he has not 'executed and performed all the duties required of and imposed on him by the laws of the State.' "

*South,* 59 U.S. at 401. The Supreme Court answered the issue by stating that, "[i]t [the sheriff's] is a public duty, for neglect of which he is amenable to the public, and punishable by indictment only" (alteration added). *Id.* at 403.

In *Nelson,* that court also quoted from the case of *Crouch v. Hall,* 406 N.E.2d 303, 304 (Ind.App.1980):

"In our research we have found it overwhelmingly held that liability to an individual for damages will not lie where the officer or the public body owes a duty to the general

public as a whole, but it is not shown that the officer or public body owes a specific duty or has a special relationship *to the individual.*" [Emphasis added.]

The *Nelson* court then held:

"[T]his Court must conclude that the Missouri Child Abuse statute created only a duty to the public and not to individuals, and therefore cannot be said to support a cause of action in favor of individuals.

. . .

"But the public duty to investigate imposed by the statute does not suffice to establish a specific duty to these plaintiffs as individuals, the breach of which would, under applicable Missouri law, entitle plaintiffs to a private cause of action. . . .

"Neither the cases cited by plaintiffs nor those already discussed support plaintiffs' argument that reliance upon public officials to perform their public duty will transform a duty to the public into a duty to individuals.

. . .

"The Court has not overlooked the allegations in the complaint that defendants 'willfully refused' to perform the duties mandated by the Missouri Child Abuse statute and demonstrated 'complete indifference to or conscious disregard for the safety of others.' Those allegations do not state a cause of action under Missouri law.

. . .

"Finally, it should be noted that the declaration in *South v. Maryland* alleged that the sheriff, although present and able to do so, 'did then and there neglect *and refuse* to protect and defend the said Jonathan from the said unlawful conduct and threatened violence of the said evil-disposed persons, and to preserve and keep the peace of the State of Maryland. . . .' Nevertheless, the court concluded that the declaration had set forth no sufficient cause of action."

*Nelson,* 537 F.Supp. at 610–12 (citation omitted) (footnotes omitted).

Accordingly, I do not believe that any of the cases cited by the majority as inapposite actually are. They are all on point and relevant to the debate. Because the present Court, after more than one hundred and fifty years of the Court agreeing with the concepts of the cases, now chooses to disagree with them—does not make them inapposite. It seems to me, that if *stare decisis* is not going to be controlling, the Court ought to have the intellectual honesty to admit it and overrule the cases that hold to the contrary, instead of using semantical devices, *i.e.,* an overuse of the word distinguish—when there are not any distinguishing factors. Here the majority abandons *stare decisis.* As important, and distressing, is the fact that lawyers are now left with two lines of cases. One line involves numerous cases dating back a hundred years or more. The other line being this single case. They cannot know what advice to proffer to clients. If the Court is going to change the law it should, at least, specifically state that it is overruling the prior cases.

Again, I point out that this is not simply a case of an agency with a duty to investigate, not investigating. The agency investigated before the child was killed and specifically found no abuse. That finding may well be wrong, in hindsight unquestionably so, but it was the agency's decision to make, not this Court's. In my view, the statute mandates an inspection when a report is made, not continual inspections *ad infinitum* when the same person makes continual complaints about the same alleged course of abusive conduct.

Perhaps my most strenuous objection to what the majority is doing with the opinion in this case concerns the broader effects of the decision. There are a multitude of state and local governmental and administrative entities in this State, upon which are imposed by statute and regulation a myriad of responsibilities to the people of the State. The responsibilities of these agencies, for the most part, are performed by persons as imperfect as are we. Regrettably, but inevitably, they are,

when exercising discretion, going to make mistakes. Often, as in this case, those mistakes may lead to tragedy.

A very similar statute to the one the majority now states creates a duty, out of which under the majority's holding in this case, negligence actions against state agencies can now arise, is found at Health–General Article, Title 19, Health Care Facilities, *Subtitle 3. Hospitals and Related Institutions,* Part VI. Rights of Individuals, § 19–347, "**Abuse prohibited.**" In that section, reports of abuse are to be made to "an appropriate law enforcement agency, the Secretary [of Health and Mental Hygiene], or the Department of Aging." The statute then requires that "the law enforcement agency, with the assistance of the Secretary, *shall:* (i) Investigate thoroughly each report of an alleged abuse; and (ii) Attempt to insure the protection of the alleged victim." The statute then contains an extensive assemblage of requirements, based upon the exercise of discretion by various entities, for reporting allegations, investigations etc. If, at any stage of such processes, a mistake is made, with the majority's decision today, a potential lawsuit has been created where none before existed.

Another example is Health–General Article (dealing with the developmentally disabled), § 7–1005(c) *"Duties of law-enforcement agencies,"* that requires a law enforcement agency that receives a report of abuse to "(i) Investigate thoroughly each report . . . and (ii) Attempt to ensure the protection of the alleged victim." With the Court's opinion in the present case, if a police agency conducts an investigation and mistakenly makes a determination that no abuse has occurred, it will have subjected itself (or the governing entity of which it is a part—or both) to tort liability. Interestingly, the Legislature has, in another section relating to other requirements, shown in this Title that when it wants to create civil liability in respect to health issues it knows how to do so. In *Subtitle 11. Prohibited Acts; Penalties; Civil Liability,* § 7–1101(d) the Legislature provided specifically:

"(d) *Civil damages.*—In addition to any other penalties specified in this section, an individual who is admitted or held against the individual's will by a person who is provid-

ing services without a license may recover civil damages from that person and from any other person who knowingly participates in the admission or detention."

The inclusion of this section certainly establishes that the General Assembly knows how to create civil liability when it establishes programs for the protection of the general population.

Section 10–705 of the Health–General Article contains almost exactly the same provisions as Title 7, requiring law enforcement entities who receive reports of abuse of another broad class of persons (mentally ill individuals) to investigate and secure protection for them. As with the case at bar, if the agency in the exercise of its discretionary function of investigation makes a mistake, civil tort liability, as a result of the majority's position in this case, will attach.

Health–General Article, § 14–407 requires "The Department" to: "(1) Investigate complaints received regarding the youth camp; and (2) Require appropriate training, including knowledge of outdoor camping, for a camp inspector." With the majority's opinion in the case at bar, the door to civil tort liability against the governing entity charged with inspecting is opened, where a camper is injured in a youth camp, based upon a claim of inadequate inspections or a mistake in inspection, or even based upon a claim by a person injured in a youth camp that the inspectors were not adequately trained.

The Health–General Article also requires all medical and cytology laboratories to be initially inspected and to thereafter be periodically inspected. *See* § 17–202(b) of the Health–General Article. With the Court's opinion today, if an inspection is not conducted on a sufficiently periodic basis, or if it is and existing problems are not discovered during the inspection, and the oversight results in injury to a person, civil tort liability, under the reasoning of the majority's opinion, might well attach.

Health–General Article, § 18–208 requires a county health officer to: "1. investigate the suspected disease; and 2. Act properly to prevent the spread of the disease." Under the

holding of today, if that health officer's investigation, albeit in good faith, is flawed, or the actions he takes to prevent the spread of the disease are not as adequate as they might conceivably be, all those persons who might subsequently contract the disease will be citing *Horridge* as their legions march to the court houses and file suits against (in effect) their respective counties. *See also* Health–General Article, § 19–407 (requiring "The Department" to "Inspect the operations of each home health agency to determine whether it is meeting the requirements . . .").

Section 20–302 of the Health–General Article states that the "Secretary" may "investigate all nuisances that affect the public health and devise means for the control of these nuisances." If a public nuisance also constitutes a private nuisance, *e.g.*, sewage leaking from failed septic systems, is the State liable under the majority's reasoning of the day, to a specific adjacent landowner whose property is overrun by the sewage if the State does inspect and makes a mistake? Is the State going to be liable if the health of numerous citizens' is impaired? Other provisions of Title 20 require the Secretary, upon receiving certain complaints, to investigate whether certain conditions are likely to "injure any adjacent property. . . ." If the Secretary does not act promptly, or if he acts and mistakenly determines that the condition will not injure adjacent property or persons, and then it does, will the State be liable in individual actions? Subsequent to *Horridge*, a strong argument can be made that the specific property or the person, are just such types of properties ("adjacent") or persons that statute was designed to protect. I fail to see how such a situation could be distinguished (except perhaps as to the severity of the result—but, of course, court decisions are not to be result-driven).

While the general provisions of the regulation of food establishments, *i.e.*, restaurants etc., provide for permissive inspections, and, presumably, the State or a local health department could argue that illnesses relating to food do not result from the failure of a required inspection, some areas of food regulation require mandatory inspections. Health–General Article,

§ 21–413, requires initial and periodic inspection of facilities involved in the production of milk. Under *Horridge,* it will be argued, for example, that the litigant sickened by bad milk products was injured as a result of a deficient investigation or inspection. Section 21–809 of the Health–General Article also requires mandatory inspections in respect to frozen food facilities.

Health–General Article, Title 24, Miscellaneous Provisions, *Subtitle 4. Bedding,* which in large part is concerned with the disinfecting of used bedding, permits, in Part III, § 24–416, the inspection by the Secretary of all places where bedding is made, renovated or sold. Though perhaps an extreme example (except to the person being bitten), under *Horridge* an argument could be made that the State is liable to a person who has been subject to bedbug infestations after purchasing a used mattress with a disinfected tag affixed by an entity inspected by the Secretary. Certainly, the class of persons that statute purports to protect includes the purchasers of disinfected mattresses.

Health–Occupation Article, § 9–314, **"Investigations; grounds for reprimands, suspensions, and revocations,"** provides that the "[State] Board [of Examiners of Nursing Home Administrators] shall investigate and take appropriate action as to any complaint ... that a licensee has failed to meet any standard of the Board." After the majority's opinion becomes the law in Maryland, if the Board investigates, but mistakenly determines that standards are being met (when actually a standard is not being met), and a person is injured as a result, an action will lie against the Board, *i.e.,* the State. Section 14–303 of the Family Law Article, in respect to "vulnerable adult[s]," requires a "local department" upon a report to "begin a thorough investigation." In that investigation the local department is to determine whether the adult is vulnerable and whether there has been "abuse, neglect ... or exploitation." Ultimately, it must make a determination whether the adult is in need of "protective services." With the Court's opinion in the present case, all administrative departments (whether of State or local governments) become

liable in tort if they make a mistake in any of their discretionary determinations.

Public Safety Article, Title 5, Firearms, *Subtitle 3. Handgun Permits*, § 5–306, among many other things, requires the Secretary to conduct an investigation into an applicant's "propensity for violence or instability." Such an investigation and determination are necessarily subjective, and the Secretary's performance of such an investigation involves the exercise of discretion. Subsequent to the case at bar, it will be argued that the Secretary should be liable to those injured by such a permit holder, because the act of injury itself is proof that the wrongdoer had a propensity for violence or was unstable, and thus the exercise of discretion was wrong, and the State should be liable. The same could be said of firefighting officials. Title 6, *Subtitle 3*, § 6–303, requires every fire department or volunteer squad to run a criminal records check of applicants and permits them to exercise discretion in the hiring of persons with criminal records. Under § 6–307, **"Inspections,"** the State Fire Marshall is required to inspect a large classification of public and non-dwelling private buildings for fire exits and safety standards. If an inspection is defective, a fire occurs, and injuries and/or deaths occur, will the State be liable for tort damages, based solely upon the defective inspection?

Under Title 12, *Subtitle 2. Statewide Building and Housing Codes*, § 12–202(e) of the Public Safety Article, the Department of Housing and Community Development "shall investigate [any alleged violation of the 'Maryland Accessibility Code' (a code to make buildings accessible to persons with physical disabilities) ] to determine if a violation exists." Presumably, if the Department makes a mistake in determining whether a building is "accessible," and as a result a disabled person is injured attempting to access a building, the State will now be liable. This statutory provision as to the subjects it is designed to protect is at least as specific as the statute the majority bases the creation of this new liability on in the case at bar.

Agricultural Article, § 3–104, "**Local health authorities and veterinarians required to report contagious and infectious diseases**," states "every local health authority of every county shall investigate each reported case of contagious or infectious disease of livestock or poultry in the county. If the authority finds a contagious or infectious disease, it shall report to the Secretary [of Agriculture]." The Secretary is given a broad range of powers to deal with the disease, including the destruction of any animal exposed to the disease. Under this authority, hundreds of thousands, if not millions, of chickens have been destroyed over the years. Suppose the health authority fails to investigate, or does investigate but makes a mistake in diagnosing, or failing to diagnose the disease, and millions of chickens are either wrongfully destroyed, or, if exposed are not destroyed and they infect other chickens. Under the majority's holding, actions in negligence against the State may arise in respect to damages or consequential damages, even where the injury is to a person's livelihood, as opposed to his or her health.

The Labor and Employment Article, in § 3–206 in respect to work permits, subparagraph (d)(2)(i) permits the Commissioner to issue work permits for certain occupations not normally permitted to a minor if, "after investigation, the Commissioner determines that neither the work nor the work site where the work is to be performed is hazardous to the minor . . . ." If a minor is later injured doing the work, it will be argued that the Commissioner, in his required investigation, made a mistake, and that under *Horridge*, the State is liable for the damages to the minor.

In the same article, in § 5.5–114, "**Request for inspection**," railroad employees may request inspections of railroads. Upon receipt of such requests, if the Commissioner determines that there are reasonable grounds supporting the request, he "shall conduct an investigation as soon as practicable to determine whether the danger or threat exists." He or she is then given powers to deal with the findings of the investigation. Now, with the majority's opinion, if the Commissioner receives such a request and does not conduct an investigation

as soon as some court fact-finding entity, after the fact, believes was practicable, or if the Commission conducts a prompt investigation, but in the exercise of his or her discretion, determines that no threat exists, but is mistaken, and an accident happens because of a defect, the State will be liable in tort. Obviously, this particular statute is designed to protect a class of persons, which includes passengers. If an Amtrak passenger train derails in Maryland, with hundreds, probably thousands of passengers, the State will join the railroad companies as defendants—probably as the prime defendant in that the passenger railroads are generally in a state of financial insecurity, whereas the State has the ultimate deep pockets.

Business Regulation Article, *Subtitle 4*, which deals with the regulation of amusement attractions, requires, in § 3–402, **"Inspections and investigations,"** that the Commissioner of Labor and Industry "shall inspect: (1) each amusement attraction at an amusement park annually; (2) each amusement attraction, if moved, before it begins operation at another location; and (3) each new or modified amusement attraction before it begins public operation." The Commissioner is also required to investigate complaints or accidents and to reinvestigate the amusement attraction. With the decision in the present case, if the Commission makes a mistake during any of the many (given the frequency with which amusement attractions may be moved) investigations he conducts, and someone is injured by a defective ride, the State will now join the amusement attraction operator as a defendant.

The Environment Article, in § 10–202, requires the Secretary of the Environment to investigate any complaint made by three or more people in respect to certain alleged conditions that include a condition where there exists "[a]ny water in which mosquito larvae breed." The still bodies of fresh water in this State, as well as much of the brackish waters, are susceptible (one who is frequently mosquito-bitten supposes) to inspections by the Secretary. That includes most of the Eastern Shore. If the Secretary does not make a prompt inspection, and a person is bitten as a result of mosquitos

hatching from the larvae in waters the Secretary had been informed contain larvae, and the bitee contracts malaria, West Nile or any other mosquito-transmitted disease, is the State going to be liable?

Inmates in correctional institutions, in addition to the customers of the various State and local health organizations that I have not mentioned (and there may be scores, if not hundreds of them), students and their parents in secondary and higher education entities, all of them, and more, will now look for any statute that imposes responsibilities upon administrative agencies (including the Administrative Office of the Courts), and using the majority's opinion go to court anytime they perceive that a State employee has not exercised his discretion appropriately, and they have been damaged as a result. If that is to be the future of litigation against the State and its local governments, it should be a policy decision by the Legislature not by this Court.

Today, for the first time, the majority imposes tort liability against governmental entities arising out of discretionary governmental decisions where the state actor has not acted affirmatively to place the alleged victim in danger.

While it will not happen right away, unless the Plaintiff's bar is in, and stays in, a state of mental hibernation, the rain will come. A deluge of litigation will fall upon (and into) the State's big pockets.

The Circuit Court correctly applied the law as it existed prior to this case. I would affirm its correct decision.

Judge BATTAGLIA has authorized me to note that she joins in this dissent.