842 A.2d 53

Donna WALKER, et al.

v.

**DEPARTMENT OF HUMAN RESOURCES.**

No. 49, Sept. Term, 2003.

Court of Appeals of Maryland.

Feb. 11, 2004.

**408**

Joel A. Smith (Keith J. Zimmerman of Kahn, Smith & Collins, P.A., on brief), Baltimore, for appellants.

C.J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, and Stephanie A. Lewis, Staff Attorney, Baltimore), on brief, for appellee.

Argued before BELL, C.J. RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

WILNER, Judge.

Title 12 of the State Personnel and Pensions Article of the Maryland Code (SPP) sets forth a grievance procedure for most Executive Branch State employees. The question before us is whether that procedure is available to resolve the particular kind of complaint filed by appellants, who are employed by the Baltimore City Department of Social Services (BCDSS), a unit of the State Department of Human Resources (DHR). An administrative law judge, acting for the State Department of Budget and Management (DBM), found that the statutory grievance procedure was not applicable and dismissed their complaints. On judicial review, the Circuit Court for Baltimore City affirmed that decision. We granted *certiorari* to consider the issue and shall affirm the judgment of the Circuit Court.

## BACKGROUND

### *The Statutory and Contractual Framework*

Subject to certain exceptions, SPP § 12–102(a) makes the grievance procedure set forth in title 12 of the article applicable to all employees in the State Personnel Management System within the Executive Branch. One of the exceptions, stated in § 12–102(b)(6), is that the title does not apply to an employee "who is subject to a collective bargaining agreement that contains another grievance procedure." Section 12–103(a) broadly permits an employee to present a grievance free from coercion, discrimination, interference, reprisal, or restraint, and § 12–103(b) states that, unless another procedure is provided for by SPP, that grievance procedure is the exclusive remedy through which a non-temporary employee in the State Personnel Management System "may seek an administrative remedy for violations of the provisions of this article." A "grievance" is defined in § 12–101(b) as a dispute between an employee and his/her employer about the interpretation of and application to the employee of "a personnel policy or regulation adopted by the Secretary [of Budget and Management]" or "any other policy or regulation over which

management has control." That definition is critical to our decision.

With certain exceptions, §§ 12–201 through 12–205 create a three-step procedure for resolving grievances. Step 1, provided for in § 12–203, is the filing of a written grievance with the employee's "appointing authority" within 20 days after (1) the occurrence of the alleged act that is the basis of the grievance, or (2) the employee first knew or should have known of that act. Within 10 days after receiving the grievance, the appointing authority, through its designee, is required to confer with the employee and attempt to resolve the grievance, and within 10 days after that conference, to issue a written decision in which any relief permissible under § 12–402(a) may be awarded. That relief is limited to restoration of rights, pay, status, or benefits that the employee otherwise would have had if the contested policy, procedure, or regulation had been properly applied.

If the employee is unhappy with the result of Step 1, the employee or the employee's representative may, within 10 days after receiving the Step 1 decision, move to Step 2, which is an appeal to the head of the employee's principal unit, or that person's designee. *See* § 12–204. Within 10 days, that person must review the grievance record, confer with the employee, and attempt to resolve the grievance. The unit head must render a written decision within 10 days after the conference. Step 3, set forth in § 12–205, is an appeal to the Secretary of Budget and Management, which must be taken in writing by the employee or his/her representative within 10 days after receipt of the Step 2 decision. If the Secretary does not concur with the Step 2 decision, he/she must first attempt to reach an agreeable and binding settlement, and, if that is unsuccessful, refer the grievance to the Office of Administrative Hearings (OAH) for a contested case hearing and final administrative decision under the Administrative Procedure Act (State Government Article, title 10, subt. 2).

In 1999, the General Assembly enacted legislation intended to supersede an Executive Order that had previously been

issued by the Governor (Executive Order 01.01.1996.13) and, by statute, establish limited collective bargaining rights for State Executive Branch employees. *See* 1999 Md. Laws, ch. 298. It achieved that objective by repealing existing provisions in title 3 of SPP that called for employee/management teams in each of the principal units of the Executive Branch, and replacing those provisions with a new title 3 dealing generally with collective bargaining. Subject to certain exceptions and limitations, the new law gives Executive Branch employees the right to form, join, and participate in employee organizations and to engage in "other concerted activities for the purpose of collective bargaining" (or to refrain from doing so) and, without the intervention of such an organization, to "discuss any matter with the employer." § 3–301. The law provides for the creation of bargaining units and the election of exclusive representatives for employees in those units, and it sets forth procedures for the negotiation of a "memorandum of understanding" (MOU).

With certain exceptions, § 3–502 provides that collective bargaining shall include "all matters relating to wages, hours, and other terms and conditions of employment." One of the caveats to that broad scope is that the employer is not *required* to negotiate on any matter that is inconsistent with applicable law but *may* negotiate and reach agreement on such matters, so long as it is understood that the agreement as to those matters cannot become effective unless the applicable law is amended by the General Assembly. An MOU must be in writing and ratified by the Governor. It may not be for less than one year or for more than three years. § 3–601.

Appellants, Donna Walker, Ravital Shalev, and Michelle Moore–Powell, are within the category of employees covered by the title 12 grievance procedure. They are also covered by an MOU that was entered into by the State and Council 92 of the American Federation of State, County, and Municipal Employees (AFSCME) on June 7, 2000, and that was to remain in effect until June 30, 2002. Article 30 of that MOU provides a dispute resolution procedure. Using the terms "complaint" and "dispute" rather than "grievance," the Article

sets forth a four-step procedure for resolving disputes "concerning the application or interpretation of the terms of this MOU."

That procedure differs in two principal respects from the grievance procedure established under title 12 of SPP, one of which is critical here. Step 1, which must be triggered within 15, rather than 10, days after the event giving rise to the complaint (or the time the employee should reasonably have known of its occurrence), involves a discussion with the employee's immediate supervisor. The supervisor must attempt to resolve the dispute and respond orally within three days. Initial resort to the immediate supervisor is not expressly provided for in the statutory grievance procedure; that is one of the differences, but not an important one in this case. Step 2, which must be requested within seven days after receiving the supervisor's response, involves a written complaint to the appointing authority, who must meet with the employee and the union representative and respond in writing within 20 days. Other than the time limits, that is essentially Step 1 of the statutory grievance procedure.

If the complaint is not resolved at Step 2, Step 3 may be generated by a written complaint filed with the head of the principal unit, unless that person is also the appointing authority. The unit head must also meet with the employee and the union representative and has 20 days to render a written decision. Step 3 of the MOU procedure is equivalent to Step 2 of the grievance procedure. Step 4 is quite different from the final stage of the grievance mechanism which, as noted, involves an appeal to the Secretary of Budget and Management and a possible contested case hearing before an Administrative Law Judge. If an MOU complaint is not resolved at Step 3, AFSCME may, within 30 days, invoke a fact-finding procedure involving the Federal Mediation and Conciliation Service (FMCS). If that procedure is invoked, FMCS sends the parties a list of seven fact-finders, from which, either by agreement or sequential strikes, one person is selected. The fact-finder is to resolve "all questions related to the procedure." If either side disagrees with the fact-finder's decision,

an appeal may be taken to the State Labor Relations Board, an entity within DBM that was created by the 1999 legislation. SPP § 3–208 authorizes the Board to investigate possible violations of title 3 or "any other relevant matter" and to hold contested case hearings "whenever necessary for a fair determination of any issue or complaint under this title or a regulation adopted under it." Section 3–210 provides that, if a person fails to comply with an order issued by the Board, a member of the Board may "petition the circuit court to order the person to comply with the Board's order."

It is this Step 4 procedure that is important here. OAH has no jurisdiction under the MOU procedure. If there is to be a contested case hearing, that hearing is conducted by the State Labor Relations Board, created by the General Assembly for that express purpose, among others.

### Nature of the Grievance in This Case

Appellants are classified as Family Services Case Workers II. As noted, they are employed by BCDSS, a unit of DHR. BCDSS constitutes their appointing authority; DHR is the "principal unit." The record shows that they were part of Family Preservation Unit D, although they refer to their unit as the "PDE Unit," an acronym that, from the record before us, we are unable to decipher. Their positions are regarded as entry level ones, in which they provide intensive casework services to families. See COMAR 07.02.01.05 for a description of the kinds of continuing services provided to families. The unit head was one Barbara Terry who, they said, required them to respond to calls from their clients 24 hours a day, seven days a week.

On May 31, 2001, appellants filed nearly identical grievances under the title 12 grievance procedure, complaining of "PDE Unit concerns regarding the supervisor who has caused many problems in the working environment" and alleging that Ms. Terry "violates their employee rights by using unfair labor practices and violates the agency's policies and procedures." Attached to the Appeal and Grievance Form was a document entitled "PDE Group Grievance," which listed in some greater

detail a whole range of complaints about Ms. Terry and the administration of the unit. All of those complaints save one were resolved at Step 1. The one complaint not so resolved concerns their demand for substantial retroactive "standby" pay.

It appears that, prior to the signing of the MOU, DHR had a "practice" of some sort, not reflected in any regulation and not fully described in this record, of paying $5.15/hour to employees who served in an "on call status." Art. 6 of the MOU dealt with that and with compensation for other types of extra-work week services. Some explanation is required.

Art. 6, § 2 of the MOU defined the "administrative work-week" as beginning at 12:01 a.m. on Wednesday and ending at midnight the following Tuesday. With certain exceptions not apparently relevant here, Art. 6, § 3 defined the "standard workweek" as eight hours/day, five days/week, Monday through Friday. Section 7 of Art. 6 defined "work time" as including time during which the employee was "on duty" at either the employee's principal job site or at a remote location as part of the State's Telecommuting Program. That included time the employee is "on the employer's premises and is on call and waiting for work," and time that the employee is "not on the employer's premises, but is on call and waiting for work, and the employee's personal activities are substantially restricted." Section 9, captioned "Call–Back Pay," provides that employees who are "called to report to work" on a regular day off or who have been "recalled to work" after having left the employer's premises, are entitled to a minimum of one hour of pay plus travel time.

Section 11 of Art. 6 deals with "Stand–By Pay." It provides, first, that employees are entitled to stand-by pay, at the regular or overtime rate, as applicable, "if required to remain on the Employer's premises or so close thereto that he/she cannot use the time effectively for his/her own purposes." It provides further that an employee who is not required to remain on the employer's premises "but is merely required to leave word at his/her home or with the Employer where

he/she may be reached is not working while on call." Finally, § 11 states:

"[Department of Human Resources] shall continue the current practice of paying $5.15 per hour to employees who serve in an 'on call status' through June 30, 2000. Such employees will be paid their regular or overtime compensation, as appropriate, when called to work. In February of 2000, the Employer shall negotiate the continuation or modification of this on call payment practice. Any changes will be implemented no sooner than July 1, 2000." [1]

The record before us does not give any further details with respect to this benefit-when, for this purpose, a person is in an "on call" status and for how long; nor does it indicate whether, following any negotiations that may have occurred in or after February, 2000 (four months prior to the signing of the

---

1. That provision is supplemented by what is referred to in the MOU as a "Side Letter on On–Call Pay for Department of Human Resources" that neither party has even mentioned. That "side letter," which is actually part of the MOU, recognizes that DHR requires a response to protective service cases 24 hours/day, seven days/week, but that facilities are not continuously open, which requires that staff be placed in an "on-call" status and that they must respond to calls within one hour. The "side letter" states further that, "[b]ecause of the volume of calls, as documented by the workers, and that responding to calls in a bona fide emergency directly affecting public safety, it is agreed that DHR caseworkers in an on-call status shall continue to be compensated at $5.15 per hour for their on-call time." It continues that "[s]uch employees, when in an on-call status, will be paid their regular or overtime compensation, as appropriate, when called to work." Finally, for our purposes, the "side letter" provides:

> "The Employer and the Union further recognize that this policy is unique to the Department of Human Resources and that the Legislature has included budget language that requires the Department to reduce caseloads using the CWLA caseload standard by June 30, 2003. It is understood by the Union that this is a continuation of the current practices in DHR and is not to be expanded to other employees. As new employees are hired, the need for on-call pay will be reduced."

Whether this "side letter" was intended to provide for a continuation of the benefit provided for in Art. 6, § 11, after June 30, 2000, is entirely unclear, but whatever its force, it is not relevant to this case, as neither party has relied upon it. The sole basis of appellants' grievance was Art. 6, § 11 of the MOU.

MOU), any changes were made to the practice. Indeed, the greater mystery is that, as the MOU was not signed until June 7, 2000, and the requirement in Art. 6, § 11 to continue the current practice lasted only to June 30, 2000—a period of 23 days—the requirement set forth in that section appears to have expired long before any of the grievances were filed.

In the attachment to their grievance, appellants asserted that Ms. Terry had informed them, in a variety of ways, that the PDE Unit was an "intensive 24 hour, seven days a week service," and that one of them, Ms. Shalev, had been admonished by Ms. Terry for not responding to a call at 10:00 one night about one of her cases, while she was at a sports bar watching a game. Because they were required "to be ready, willing, and able to react to any situation at any given moment after our standard workday," they claimed that they "have been working an additional 64 hours per week, without pay or compensation," and they demanded additional pay, at the rate of $5.15/hour, for an additional 64 hours/week back to the time they joined the PDE Unit. Ms. Moore–Powell, who joined the unit in July, 1999, sought an additional $329.66 for 104 weeks, or $34,282; Ms. Walker sought the same weekly amount for 44 weeks, for a total of $14,505; and Ms. Shelev, claiming 24 weeks of entitlement, sought $7,911.[2] Those grievances were expressly based on the alleged violation of Art. 6, § 11 of the MOU, and not on any policy or regulation of DHR or DBM.[3]

---

**2.** We are unable to understand how the figure of 64 additional hours was derived. If the claim was that appellants were effectively working 24 hours a day, seven days a week, the entitlement would seem to be for128 hours (168 total hours less 40 hours worked during the standard work week). Given the limited issue before us, the discrepancy is not important.

**3.** Holding aside the problem of the requirement under Art. 6, § 11 lasting only until June 30, 2000, at least the claims made by Ms. Walker and Ms. Shalev cover only the period after the MOU was signed and took effect. Part of Ms. Moore–Powell's claim covered a period prior to the effective date of the MOU. She did not indicate the basis for any conclusion that the MOU itself could be applied retroactively, to provide benefits for a time prior to its effective date.

The Step 1 proceeding was a conference with designees of BCDSS, the appointing authority. They recognized that the grievance was based on the two basic provisions of MOU Art. 6, § 11—that DHR would continue their policy of paying $5.15/hour to employees in an "on call" status, and that employees were entitled to stand-by pay if they are required to remain on the employer's premises or so close as to be unable to use the time for their own purposes. They noted that there was very little evidence supporting a right to additional pay, which they regarded as "overtime" under those provisions. Ms. Moore–Powell said that on July 16 and 17, 2001, she received a phone call that required her to act on behalf of one of her clients and that she also received a call from Ms. Walker seeking assistance. Ms. Terry stated that persons assigned to the Family Preservation Unit were advised that they must be available (on call) around the clock, but that it was not always necessary that the worker physically respond to a situation—that all that might be necessary was to call the police or a physician. That was confirmed by Ms. Graves, Chief of Operations, who said that, although appellants were required to carry a beeper, it was not necessary for them to "physically" respond to every situation.

The BCDSS designees found that there had been a breakdown in communication between appellants and their supervisor, that there was little testimony that would alert management either to the dates or the amount of time appellants were allegedly covered under Art. 6, § 11 of the MOU, and that management would therefore "have no idea as to the amount of overtime they are entitled to." The designees noted that, "as a resolution to this portion of the grievance," management and appellants had agreed "to effectively discuss this issue and reach an agreement whereby the appellants (if eligible) will be compensated." Presumably in light of that agreement, and the lack of sufficient evidence to support a specific award, no award was made by the appointing authority.

As no agreement was ever reached, AFSCME, on behalf of appellants, appealed to Step 2—designees of the Secretary of

DHR. At that stage, two defenses were raised—whether the grievance was filed timely, within 20 days after the alleged act that served as the basis for the grievance, and whether the dispute constituted a grievance under title 12 of SPP. The DHR designees found against appellants on both grounds and denied the grievance. As to timeliness, they concluded that appellants knew of the act forming the basis of the grievance 104, 44, and 24 weeks, respectively, before the grievances were filed and, for that reason, the grievances were untimely. With respect to the second issue, they noted that the MOU was the sole basis cited for the claim, that the MOU has its own exclusive procedure for resolving complaints concerning the interpretation of that agreement, and that SPP § 12–102(b)(6) excludes from title 12 an employee "who is subject to a collective bargaining agreement that contains another grievance procedure." That ruling, as articulated, assumed that the MOU qualified as a collective bargaining agreement for purposes of § 12–102(b)(6).

Appellants then invoked Step 3 with an appeal to the Secretary of Budget and Management, who referred the matter to OAH for a contested case hearing and final administrative decision. The employer party in the Step 3 proceeding was DHR, which raised the two defenses raised at Step 2—that the grievances were untimely and that they did not constitute proper grievances under title 12. Appellants offered two responses to the untimeliness defense. First, they argued that the grievance had, in fact, been accepted at the Step 1 proceeding—that the designees of BCDSS recognized the grievance and resolved it by leaving it to the employer and appellants to work out how much the employees should receive. Second, they asserted that, although the right to standby pay was recognized in the MOU, it stemmed from a DHR policy and that, as it was that policy that was not properly implemented, a grievance under title 12 was permissible.

After hearing argument on both issues, the Administrative Law Judge found the first defense, which was jurisdictional in nature, persuasive. She concluded that OAH therefore had no jurisdiction in the matter and thus found it unnecessary to

consider the timeliness question. The ALJ noted that Art. 6, § 11 of the MOU specifically addresses stand-by pay and that Art. 30, § 1 of the MOU provides that the dispute resolution procedure in Art. 30 "shall be the only procedure for complaints concerning interpretation or application of the MOU." Accordingly, she held, the instant dispute must be resolved through the MOU dispute resolution procedure. She also noted, without elaboration, that SPP § 12–102(b)(6) provided that the statutory grievance procedure did not apply to an employee who is subject to a collective bargaining agreement that contained another procedure.

Appellants sought judicial review in the Circuit Court for Baltimore City, raising essentially three issues. First, they argued that the intent of the 1999 law was to expand, not restrict, employee rights and, in furtherance of that intent, it was impermissible to take away statutory grievance procedure rights simply because an alternative mechanism was provided for in an MOU. Second, they disputed that an MOU constituted a collective bargaining agreement for purposes of SPP § 12–102(b)(6). Third, although they had never invoked the MOU procedure, they posited that it was likely to be ineffectual because the ultimate decider was the State Labor Relations Board, which was a unit within DBM.

In a memorandum opinion filed January 6, 2003, the court rejected those defenses and affirmed the administrative decision. The court found insufficient evidence of any intent by the General Assembly "to allow employees the advantage of two appeal processes," which would allow them, theoretically, to pursue both simultaneously "and choose the more favorable of two possibly different results." The court also rejected the notion that the MOU process was ineffectual, especially as it had never been invoked.

## DISCUSSION

For some of the reasons set forth above, the substantive basis for appellants' claim is at best murky, but that is not the issue before us because it was never addressed by the ALJ.

The only issue in this appeal is whether the claim is cognizable under the SPP title 12 grievance procedure. If it is not—or if it may be presented only through the MOU dispute resolution procedure—OAH, indeed, did not have jurisdiction, because it is not part of the MOU procedure. Under the MOU procedure, the final step is the fact-finding process with an appeal to the State Labor Relations Board.

Appellants press the arguments they made before the ALJ and the Circuit Court—that (1) an MOU does not constitute a collective bargaining agreement for purposes of SPP § 12–102(b)(6), and (2) the dispute resolution procedure set forth in Art. 30 of the MOU is not exclusive. The State now concedes the first point—that "the Memorandum of Understanding is not a collective bargaining agreement, for the purposes stated in appellants' brief"—so that issue is no longer before us in this case and we shall therefore not address it. The question is the scope of Art. 30 of the MOU and the effect of the exclusivity provision therein. Four provisions bear on that question—the definition of "grievance" for purposes of SPP title 12, the function and effect of an MOU, as provided for in SPP §§ 3–501(d) and 3–601, and the language of § 30 of the MOU before us.

The basic rules of construction with respect to these provisions are clear and consistent. As to the statutory provisions, two precepts are controlling here. Our preeminent goal is to discern and implement legislative intent, and, to do that, we begin with the plain meaning of the statutory language. If the intent is clear from that language, there is no need to search further. *Allstate v. Kim*, 376 Md. 276, 290, 829 A.2d 611, 619 (2003). Here, as noted, we must examine sections of titles 3 and 12 of SPP, are both a part of a comprehensive law on State personnel policy and thus have a clear inter-connection. We must therefore try to read them together, harmoniously, and not construe them either to render one nugatory or to create unnecessary conflict among them. *See GEICO v. Ins. Comm'r*, 332 Md. 124, 132–33, 630 A.2d 713, 717–18 (1993); *Breitenbach v. N.B. Handy*, 366 Md.

467, 480, 784 A.2d 569, 577 (2001); *Whiting–Turner v. Fitz-patrick,* 366 Md. 295, 302–03, 783 A.2d 667, 670–71 (2001).

Though perhaps not a collective bargaining agreement for purposes of SPP § 12–102(b)(6), the MOU is clearly a contract between the State and AFSCME, acting as exclusive representative of appellants and their colleagues in the bargaining unit. Maryland courts adhere to the principle of the objective interpretation of contracts, which produces a policy consistent with the way statutes are to be interpreted; *i.e.,* if the language employed is unambiguous, "a court shall give effect to its plain meaning and there is no need for further construction by the court." *Wells v. Chevy Chase Bank,* 363 Md. 232, 251, 768 A.2d 620, 630 (2001); *Taylor v. NationsBank,* 365 Md. 166, 178–79, 776 A.2d 645, 653 (2001). We also attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect. *Jones v. Hubbard,* 356 Md. 513, 534–35, 740 A.2d 1004, 1016 (1999); *Bausch & Lomb v. Utica Mutual,* 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993), *appeal after remand,* 114 Md.App. 718, 727, *aff'd in part, reversed in part,* 355 Md. 566, 735 A.2d 1081 (1999).

It is possible to read the relevant statutory and contractual provisions together, both harmoniously and consistently with their plain meaning. We start with SPP, § 12–101(b), which defines "grievance," for purposes of the statutory grievance procedure, as being "a dispute between an employee and the employee's employer about the interpretation of and application to the employee of: (i) a personnel policy or regulation *adopted by the Secretary [of DBM];* or (ii) any other policy or regulation *over which management has control."* (Emphasis added). As we have observed, it appears that, prior to the MOU, DHR had a "practice" of paying $5.15/hour to employees who served in an "on call status." There is nothing in this record to indicate that this "practice" was in the form of a "personnel policy or regulation adopted by the Secretary [of DBM]" or indeed in the form of any other regulation adopted by any agency. To the extent that it

constituted a "policy" on the part of DHR, it would presumably have been one over which the management of that agency had control, and, if the dispute concerned the interpretation or application of that policy, the dispute would have constituted a grievance within the meaning of § 12–101(b).

The clear objective of title 3 of SPP was to allow a wide range of personnel policies to be developed and implemented contractually, through the collective bargaining process, rather than imposed, and thus withdrawable, unilaterally by the various State agencies. That is implicit in a number of provisions within title 3. Section 3–101(c) defines "collective bargaining" as good faith negotiations with the intention of (1) reaching an agreement about wages, hours, and other terms and conditions of employment, and (2) incorporating the terms of the agreement in an MOU. With enumerated limited exceptions, § 3–502(a) permits collective bargaining to include "all matters relating to wages, hours, and other terms and conditions of employment," and § 3–601(a) directs that an MOU shall contain "all matters of agreement reached in the collective bargaining process." Unless matters contained in an MOU are inconsistent with existing law and thus, under §§ 3–501(d)(2) and 3–502(c), require legislative approval, an MOU constitutes a contractual undertaking by the State, enforceable pursuant to § 3–210.

Art. 6, § 11 of the MOU represents a fulfillment of that objective. What apparently had been merely a DHR "practice" of paying $5.15/hour stand-by pay became a contractual obligation, at least through June 30, 2000. That practice was no longer discretionary with DHR and was thus no longer one over which DHR management had control. Appellants made clear in their grievance that their entitlement to the stand-by pay was based on Art. 6, § 11, and not on any discretionary DHR practice or policy. The dispute, therefore, was one founded solely on the MOU. That necessarily triggered the dispute resolution procedure established in Art. 30 of the MOU, which § 1 of that Article states is "the only procedure for complaints concerning interpretation or application of the MOU."

We do not construe this language as withdrawing all, or indeed any, right of an employee covered by both an MOU and by SPP title 12 to use the grievance mechanism provided in the title 12, when the provisions of that title apply. Art. 30, § 1 of the MOU makes that clear by providing that "[d]isciplinary appeals/grievances otherwise appealable through procedures established by law or regulation are not subject to [the MOU] procedure." If a dispute arises from a personnel policy or regulation of DBM or a policy or regulation over which management has control, and thus constitutes a grievance under title 12, the employee may, and indeed must, use that procedure, even if the matter is also covered in some way by an MOU.

The mere existence of an MOU does not, therefore, deprive an employee of the statutory grievance procedure. Art. 30, § 1 clearly precludes parallel and alternative procedures for resolving disputes and carefully delineates when each of the two procedures is exclusively applicable. If the dispute falls within the ambit of the title 12 grievance procedure, the MOU procedure is not available; the employee has only the title 12 procedure. The exclusivity of the MOU procedure comes into play only when (1) the basis of the dispute arises solely from a provision of an MOU, (2) the dispute concerns the interpretation or application of the MOU, and (3) the dispute no longer falls (or perhaps never fell) within the definition of a grievance for purposes of title 12. We affirm the judgment of the Circuit Court because that is the case here.

JUDGMENT OF CIRCUIT COURT AFFIRMED, WITH COSTS.