949 A.2d 19

**Larry YINGLING**

v.

**MILLENNIUM INORGANIC CHEMICALS, et al.**

**No. 75, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

May 29, 2008.

**126**

Matt M. Paavoal (Workers' Comp. Law Firm, LLC, on brief), Baltimore, for appellant.

Jeffrey Y. Laynor, Baltimore, for appellee.

Panel: EYLER, DEBORAH S., WRIGHT and SHARER, J. FREDERICK (Ret'd, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

Larry Yingling, the appellant, challenges a judgment by the Circuit Court for Baltimore County denying, as time-barred, his request to re-open his temporary total disability benefits claim against Millennium Inorganic Chemicals ("Millennium"), his employer, and Pacific Employers Insurance Company, its insurer, the appellees. He poses two questions for review, which we have rephrased: [1]

I.  Did the circuit court err by ruling that Yingling's request to re-open his claim for temporary total disability benefits was time-barred by the five-year limitations provision in Md.Code (1957, 1999 Repl.Vol., 2007 Cum. Supp.) section 9–736(b)(3) of the Labor and Employment Article ("LE")?

---

1.  The questions as phrased by Yingling are as follows:

   "1.  Was the employer's involuntary payment of wages to an employee while attending a medical examination required by the insurer a 'compensation payment' under LE § 9–667 sufficient to toll the five year limitations rule?

   "2.  Alternatively, was the Commission even bound by the five year limitations rule when asked to modify the 2000 award of compensation?"

II. If not, was the Workers' Compensation Commission bound by that limitations provision when it was asked to modify a 2000 "Award of Compensation" by the Commission?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

Yingling has been employed by Millennium since 1972. On April 1, 1995, he sustained an accidental injury in the course of his employment. As a consequence, he lost time from work in 1995, 1996, 1997, and 1998. On February 11, 1998, the Workers' Compensation Commission ("Commission") awarded him temporary total disability ("TTD") benefits for his lost time from work. The last TTD benefits were paid on April 13, 1998.

In 1999, Yingling filed issues with the Commission seeking authorization for neck surgery for treatment of his injury. The issues were heard and on February 17, 2000, the Commission issued an "Award of Compensation" authorizing "treatment as recommended by Dr. Kenneth Murray" and payment of TTD benefits to commence on the date of the surgery.

Despite the Commission's award, Yingling did not follow through with Dr. Murray's treatment plan or undergo neck surgery.[2] At some point in October of 2003, more than three and one-half years after the award was issued, Yingling asked Millennium to authorize surgery for his neck *and* back.

Millennium opted to have Yingling undergo an independent medical examination ("IME"). By letter of January 19, 2004, Yingling was notified that the IME had been scheduled for February 26, 2004, at noon, at the office of neurosurgeon

---

2. There was evidence that Dr. Murray referred Yingling to another doctor, who became his primary treating physician, and that that doctor did not agree that surgery was needed right away. Only after numerous tests, and a substantial period of time, did that doctor later come to the opinion that surgery was needed.

Richard Cohen, M.D., at Greater Baltimore Medical Center ("GBMC"). Yingling already was scheduled to work a twelve hour shift on February 26. His supervisor told him that he would be taken off the schedule for that day. Yingling protested that he did not want to be taken off the schedule. Rather, he would come to work that day and attend the IME, and he expected to be paid his regular wage for the full day, including the time the examination would entail. His supervisor advised Yingling that he would not be paid for the time spent attending the IME.

Yingling complained to his union representative, who intervened and had discussions with representatives of Millennium. As a result, Millennium and Yingling entered into an agreement, as memorialized in a February 9, 2004 memorandum from Rodney Hagins, Yingling's supervisor, to Yingling. The memorandum states:

> Larry, you have requested time off to go for your Independent Medical Evaluation (IME), on February 26, 2004 at 12:00 PM. I have made arrangements on the labor schedule to cover your JOB while you are off site. You will be expected to report to work at your normal starting time at 8:00 AM, you can leave for your appointment at 10:30 am. After you have finished with your Evaluation you will be expected to report back to work. You will be allowed 1½ hours for travel time. You will need a signed document from G.B.M.C. or the Doctor stating the time they were finished with you.

In fact, Yingling attended the IME on February 26, 2004, and was paid his full regular wage for that day.

Based on the IME and information in the records of Yingling's treating neurosurgeon, Millennium denied the request for neck and back surgery.

On September 29, 2004, six and one-half years after the last (April 13, 1998) payment of TTD benefits, Yingling filed issues with the Commission seeking authorization for the surgeries and for TTD benefits. On October 22, 2004, Millennium filed issues challenging the surgeries as not medically necessary for

treatment of the injuries and opposing the TTD benefits request on the ground that it was barred by the five-year limitations provision in LE section 9–736(b)(3).

The Commission held a hearing on the issues on February 9, 2005. On March 15, 2005, it entered an order denying the authorization request for the surgeries and ruling that the TTD benefits request was time-barred.

Yingling filed an action for judicial review in the Circuit Court for Baltimore County. By then, he had undergone both surgeries. The case was tried to the court in an evidentiary hearing, in which testimony and other evidence that was not presented to the Commission was introduced. The court reversed the Commission's decision denying authorization for the neck surgery, affirmed its decision denying authorization for the back surgery, and further affirmed its decision denying TTD benefits on the basis of limitations.

Yingling noted a timely appeal of the circuit court's decision denying him TTD benefits.

## DISCUSSION

### I.

The Maryland Workers' Compensation Act is codified at LE sections 9–101 *et seq.* ("the Act").[3] Three sections of the Act bear on the contentions advanced in this appeal. First, in pertinent part, section 9–736 provides:

(b) *Continuing powers and jurisdiction; modification.*—(1) The Commission has continuing powers and jurisdiction over each claim under this title.

(2) Subject to paragraph (3) of this subsection, the Commission may modify any finding or order as the Commission considers justified.

---

**3.** Unless otherwise provided, all further statutory references are to the Labor and Employment Article of the Maryland Code (1957, 1999 Repl.Vol., 2007 Cum.Supp.).

(3) [T]he Commission may not modify an award unless the modification is applied for within 5 years after the latter of:

(i) the date of the accident;

(ii) the date of disablement; or

(iii) *the last compensation payment.*

(Emphasis supplied.)  Second, section 9–667, under the "Benefits" subtitle, is captioned "Wage reimbursement," and reads:

In addition to any other compensation paid to a covered employee entitled to compensation under this title, the employer or its insurer shall reimburse the covered employee for lost wages due to time spent:

(1) *being examined by a physician or other examiner at the request of the employer or its insurer;* and

(2) attending and traveling to and from a Commission hearing scheduled as a result of a continuance caused by action of the employer or its insurer.

(Emphasis added.)  Finally, section 9–101(e)(1) defines "compensation" as "money payable under this title to a covered employee or the dependents of a covered employee." [4]

Yingling contends that the regular wage Millennium paid him for February 26, 2004, the day of his IME, was a "wage reimbursement" benefit under section 9–667, and hence was a "compensation payment" within the meaning of section 9–736(b)(3)(iii).  Therefore, the five-year limitations period in that subsection began to run on February 26, 2004, not on April 13, 1998, and had yet to expire on September 29, 2004, when he filed his request to re-open his claim for TTD benefits.  Yingling maintains that, on the facts before it, the circuit court erred in concluding otherwise.

Millennium responds that Yingling was not paid to attend the IME on February 26, 2004; rather, his regular wages were not docked for that time.  Therefore, he did not receive a "wage reimbursement" benefit under section 9–667.  Alterna-

---

4.  There is no dispute in this case that Yingling was a covered employee.

tively, even if the wage Yingling was paid for the time he spent attending the IME on February 26, 2004 qualifies as a "wage reimbursement," under section 9–667, it was not a "compensation payment," within the meaning of section 9–736(b)(3)(iii), as it was not paid incident to an order or award of the Commission.

■ We conclude that the regular pay that Yingling received for February 26, 2004, was not a "wage reimbursement," under section 9–667.

The meaning of statutory language is a question of law that we decide *de novo*. *Davis v. Slater*, 383 Md. 599, 604, 861 A.2d 78 (2004). Our primary goal in construing a statute is to "ascertain and effectuate" the intent of the legislature. *Clipper Windpower v. Sprenger*, 399 Md. 539, 553, 924 A.2d 1160 (2007). We begin with a reading of the plain language of the statutory text. *Walker v. Dep't of Human Res.*, 379 Md. 407, 420, 842 A.2d 53 (2004). "If the legislative intent is clear from this plain language reading, there is normally no need to probe further, and our inquiry comes to an end." *Casey v. Mayor and City Council of Rockville*, 400 Md. 259, 288, 929 A.2d 74 (2007).

Neither Maryland appellate court has had reason to interpret the meaning of section 9–667, as it now exists, or its predecessor statutes. Yingling argues that the opening clause of the section, "[i]n addition to any other compensation paid to the covered employee . . .," means that "wage reimbursement" is a form of a "compensation" under the Act. In the case at bar, whether "wage reimbursement" is a form of compensation is only a relevant question, however, if the regular pay that Yingling received for February 26, 2004 was, for the period of time Yingling attended the IME that day, a "wage reimbursement." The plain meaning of the word "reimbursement" does not support such a conclusion, however.

The ordinary dictionary definition of "reimburse" is "to make repayment to for expense or loss incurred" and "to pay back; refund; repay." RANDOM HOUSE WEBSTER'S COLLEGIATE DICTIONARY, 1135 (1995). *See also* MERRIAM WEBSTER'S COLLE-

GIATE DICTIONARY 1049 (11th ed.2003) (defining "reimburse" to mean "to pay back to someone" or "to make restoration or payment of an equivalent to"). In a legal context, "reimbursement" means "repayment" or "indemnification." BLACK'S LAW DICTIONARY 1312 (8th ed.2004). *See also* DICTIONARY OF MODERN LEGAL USAGE 748, 846 (2nd ed.1995) (definition of "reimbursement" merely refers to "subrogation (c)," which in turn explains that the equitable doctrine of "reimbursement" "serve[s] to prevent the unearned enrichment of one party at the expense of another by creating a relation similar to a constructive trust in favor of the party making payment in the creditor's legal rights."). In all of these definitions, reimbursement connotes repayment of a loss—not regular payment in the absence of loss. Likewise, it is clear from the context of the "shall reimburse" language in section 9–667 that, for a payment to be a reimbursement, it must be a repayment of what otherwise would be a loss: "... the employer or its insurer shall reimburse the covered employee for *lost wages....* "

In the case at bar, Yingling did not lose any wages due to time spent attending the IME at Millennium's request. He was paid his regular wage, as if he had not taken any time off to attend the IME. He was paid, not reimbursed. The regular wage that Yingling received for a full day's work on February 26, 2004, was not a "reimbursement" of wages, under the ordinary meaning of the word "reimbursement," and therefore under the plain meaning of section 9–667.

In his brief, Yingling makes much of the fact that Millennium at first was refusing to pay him for the time he would be spending at the IME, and only agreed to pay him when a union representative intervened and a written memorandum of agreement was prepared. Whether Millennium paid Yingling his regular wage for February 26, 2004 happily, or unhappily, is of no moment. The wage was paid at the time it was due, as regular pay. Yingling did not lose any wages for which he later was reimbursed. Moreover, the fact that Millennium paid the wage "involuntarily," as Yingling puts it, because he asserted his right to be paid in full, also matters not. Millen-

nium did not refuse to pay Yingling his full wage for February 26, 2004; for that reason, Yingling did not sustain a loss, and Millennium was not ordered, nor was there any reason to order it, to repay him.

Yingling's statute of limitations argument hinges upon his having received a "wage reimbursement." As explained above, he argues that a "wage reimbursement" is "compensation," under section 9–101, and further is a "compensation payment," within the meaning of 9–736(b)(3)(iii). We express no opinion about whether a wage reimbursement, if made, is "compensation" for purposes of the five-year statute of limitations. Millennium offers many legal and policy reasons why a wage reimbursement is not and should not be a payment of compensation so as to toll the running of that limitations period. Because the regular pay Yingling received for February 26, 2004, was as a matter of law not a "wage reimbursement," however, we need not decide whether a wage reimbursement is compensation within the meanings of sections 9–101(e)(1) and 9–736(b)(3)(iii).

When Yingling was paid his regular wage for the day he attended the IME, he did not receive a "wage reimbursement" under section 9–667, and therefore, even if a "wage reimbursement" were compensation, he did not receive compensation that day. The last payment of compensation Yingling received was on April 13, 1998. As his request to reopen his award of TTD was not made until more than five years after that last compensation date, it was time-barred, under section 9–736(b)(3)(iii). The circuit court properly granted summary judgment on the TTD claim on that basis.

## II.

Alternatively, Yingling contends that the Commission erred by treating the February 17, 2000 "Award of Compensation" as an "award" at all for purposes of section 9–736(b) because Yingling did not receive an "actual payment of compensation" from the 2000 "Award of Compensation." Thus, he argues, the Commission should have treated the 2000 "Award of

Compensation" as an "order" to continue treatment under Dr. Murray and to pay TTD benefits upon surgery. As an "order" instead of an "award," the request for modification would not have been subject to the five-year statute of limitations in section 9–736(b)(3). Instead, an "order" of the Commission is governed by section 9–736(b)(2), which provides that "the Commission may modify any finding or order as the Commission considers justified" without time restrictions.

■ Yingling raised this point before the Commission but not before the circuit court. Accordingly, for reasons that we shall explain further *infra*, this assignment of error is not preserved for our review.

An aggrieved party has two options when seeking judicial review of a Commission decision. Under section 9–745(e), the party can request what this Court has characterized as a "routine administrative appeal," *Bd. of Educ. for Montgomery County v. Spradlin*, 161 Md.App. 155, 160, 867 A.2d 370 (2005), in which the circuit court proceeds on the same record as the Commission and determines whether "the Commission acted within its powers and correctly construed the law and facts." § 9–745(e). *See Applied Indus. Technologies v. Ludemann*, 148 Md.App. 272, 287, 811 A.2d 845 (2002) (trial court review under § 9–745(e) is based on the record before the Commission), *cert. denied*, 374 Md. 82, 821 A.2d 370 (2003). Or, pursuant to section 9–745(d), "[o]n a motion of any party filed with the clerk of the court ... the court shall submit to a jury any question of fact involved in the case." In this manner of review, the court conducts what is " 'essentially' [a] *de novo* trial"—receiving evidence outside of the record before the Commission and making independent findings of fact. *Baltimore County v. Kelly*, 391 Md. 64, 74–75, 891 A.2d 1103 (2006); *see also Richardson v. Home Mut. Life Ins. Co.*, 235 Md. 252, 255, 201 A.2d 340 (1964). Under either mode of review, "the decision of the Commission is presumed to be prima facie correct." § 9–745(b)(1); *Kelly, supra*, 391 Md. at 74, 891 A.2d 1103.

As we observed in *Board of Education for Montgomery County v. Spradlin, supra,* although section 9–745(d) expressly contemplates a *jury* sitting as the fact-finder in such an "essentially *de novo* trial," it has long been the practice in Maryland for the trial judge to serve as the fact-finder when requested by a party. 161 Md.App. at 176–77, 867 A.2d 370. *See also* R.P. Gilbert and R.L. Humphrey, *Maryland Workers' Compensation Handbook* § 17.4 (2nd ed.1993) ("The practice is that appeals are presented to trial courts in one of two fashions: (1) the submission of the case to the judge on the basis of the record made before the Commission; or (2) a de novo evidentiary hearing before the court sitting with or without the jury.").

■ When a party pursues judicial review under section 9–745(d) by means of an "essentially *de novo* trial" in the circuit court, we review the decision of the circuit court, not that of the Commission. *See Commercial Transfer Co. v. Quasny,* 245 Md. 572, 578, 227 A.2d 20 (1967) (on appeal from a decision by the Commission, appellate "review is limited to the questions raised in the appeal to the lower court permitted by the Act"); *Gly Const. Co. v. Davis,* 60 Md.App. 602, 605, 483 A.2d 1330 (1984) (after an essentially *de novo* trial in the circuit court, this Court does not review "a decision of the [Commission] but rather that of the circuit court."), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985). And, pursuant to Rule 8–131(a), we shall not "decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." *See Montgomery County v. Ward,* 331 Md. 521, 526 n. 6, 629 A.2d 619 (1993) (explaining that, ordinarily, the Court of Appeals would not entertain an assignment of error as to the Commission's decision unless it was raised in the circuit court and Court of Special Appeals); *Applied Indus. Technologies, supra,* 148 Md.App. at 287, 811 A.2d 845 (failure to present an issue to trial court on appeal from a Commission decision was fatal to preservation of the issue for appellate review).

It is clear from the record in this case that the circuit court was proceeding under section 9–745(d), with a separate evidentiary hearing and independent findings of fact. Accordingly, our review of Yingling's claims is limited to those issues raised in or decided by the circuit court. Yingling did not argue in the circuit court that the 2000 "Award of Compensation" actually was an "order" by the Commission that could be modified at any time, and the court did not decide the issue. Therefore, the issue is not properly before this Court for decision.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**