REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 774

September Term, 2016

_____


CITY OF COLLEGE PARK, ET AL.

v.

PRECISION SMALL ENGINES, ET AL.

_____


Woodward, C.J.,
Eyler, Deborah S.,
Graeff,

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed:  June 6, 2017

In this appeal we are called upon to interpret a Memorandum of Understanding ("MOU") entered into between appellant City of College Park ("the City") and appellant Prince George's County Council, sitting as the District Council ("the County"), by which the City assumed the power to enforce County zoning violations within the City's corporate limits. The appellees are Gregory Hnarakis and Thomas Stokes, owners of 9651 Baltimore Avenue, College Park ("the Property"), and Precision Small Engines, Inc. ("PSE"), a tenant of the Property.

In the Circuit Court for Prince George's County, the appellees filed a declaratory judgment action against the appellants asking the court to declare that the terms of the MOU prohibit the City from requiring non-residential occupancy permits and building permits under City law, independent of those issued by the County. The court entered a Memorandum Opinion so ruling. On appeal, the appellants ask whether the court's ruling was legally erroneous. For the following reasons, we answer that question in the affirmative and shall reverse the judgment of the circuit court.

**FACTS AND PROCEEDINGS**

**-a-**

**Division of Zoning Authority between the County and the City**

Md. Code (2012), section 22-104 of the Land Use Article ("LU"), vests the District Council with authority to adopt zoning laws within Prince George's County. Pursuant to that authority, the County adopted its zoning ordinance, codified at Subtitle 27 of the County Code ("Zoning Ordinance"). As pertinent, the Zoning Ordinance requires County residents to apply for a use and occupancy permit ("U&O Permit") for

any non-residential use. County Code, § 27-253. Before a U&O Permit is issued, the property is inspected by the County Building Inspector and must be certified as complying with the Zoning Ordinance. *Id.* A U&O Permit is required at the time of new construction; when an occupant proposes a change in use; and when a new occupant takes possession of property, even if the use does not change. *Id.*

Separate from the Zoning Ordinance, the County also requires property owners or occupants to obtain a building permit prior to "new construction, alteration, removal, demolition, or other building operation" within the County. County Code, § 4-352(a).

A municipal corporation within the County, such as the City, does not have zoning authority except as specifically authorized by State law; however, it has "concurrent jurisdiction" within its corporate limits to *enforce* County zoning laws. LU § 22-119(a). To exercise that enforcement power, the municipal corporation must enter into a written agreement with the County, addressing:

> (1) the method by which the county will be advised of citations issued by a municipal inspector;
> (2) the responsibility of the municipal corporation or the county to prosecute violations cited by the municipal corporation;
> (3) the disposition of fines imposed for violations cited by the municipal corporation;
> (4) the resolution of disagreements between the municipal corporation and the county about the interpretation of zoning laws; and
> (5) any other matter that the district council considers necessary for the proper exercise of the authority granted by this section.

LU § 22-119(b).

On October 22, 2002, pursuant to LU section 22-119, then codified at Md. Code (1957, 1997 Repl. Vol., 2002 Supp.), section 8-112 of Article 28, the City and the County

entered into the MOU, in which they agreed that the City would assume responsibility for enforcing the County Zoning Ordinance within the City's corporate limits. The recitals state that the City "wishes to assume the duty and exercise the power of enforcement of zoning laws within its corporate limits," and the County is "willing to cooperate with the City in the enforcement of the County's zoning laws, subject to certain conditions."

The pertinent terms of the MOU are as follows. The City assumed the duty to enforce the zoning laws effective December 1, 2002, and was granted "all enforcement powers then possessed by County government[.]" ¶ 1(a). The City's assumption of those duties "shall not be deemed to diminish any City power or authority under §§8-112.1 or 8-112.3 of the Regional District Act, *or any other law*." ¶ 1(b) (emphasis added).[1]

The procedures the City must follow to enforce the County Zoning Ordinance are set forth in Paragraph 2 of the MOU. In particular, the City must follow procedures spelled out in an outline attached as "Exhibit A" to the MOU[2] and "require compliance

---

[1] As then codified, section 8-112.1 of the Regional District Act authorized a municipal corporation in Prince George's County to impose, by ordinance, "stricter or additional conditions, restrictions, or limitations upon fences, residential parking, and residential storage" than required by State or County law. Section 8-112.3 permitted the County to grant a municipal corporation zoning authority within a "revitalization overlay zone" within its corporate limits.

[2] Exhibit A sets out an 8-step process for enforcing zoning violations within the City. Step 1 is to observe or receive notice of a suspected violation. Step 2 is to investigate the suspected violation and, if it involves a "building or use for which an application is pending," to cease any enforcement. If no application is pending, under Step 3, the City continues to determine whether the violation is confirmed. If there is a confirmed violation, at Step 4 the City communicates the violation to the occupant/owner, provides time for the violation to be remedied, and provides notice of appeal rights. If the occupant/owner does not remedy the violation, at Step 5 the City
(Continued…)

on all properties within municipal boundaries, except for construction operations proceeding under a County grading or building permit and uses which are the subject of active [U&O Permit] applications on file with the [County Department of Environmental Resources, now DPIE]." ¶ 2(a). The City must enforce the Zoning Ordinance through its City enforcement officers acting under the direction of the City Manager and the City Attorney, and the City Attorney is authorized to appear before the County Board of Appeals, Planning Board, District Council, and any State court to enforce or defend claims or appeals. ¶ 2(b).

Subsection 2(c) of the MOU, which is central to the instant appeal, states:

> The City is not authorized to issue building, grading, [U&O], or other permits *now issued by the County Department of Environmental Resources [now known as DPIE]*, the City is not authorized to override Department interpretations of the Ordinance in issuing permits, and the City is not authorized to perform inspections for permit applications. The City may initiate and pursue enforcement action for any property which does not have the required permits for its use or uses.

(Emphasis added.) The City must file with the County a copy of any citation or violation notice it issues. ¶ 2(d).

The City must enforce the Zoning Ordinance consistent with its plain language and in consultation with the County Attorney to ensure consistency. ¶ 3(a). The City is

---

(…continued)
may provide an extension, along with a warning that appeal rights will be waived. At Step 6, if an appeal has been filed, the City will defend the appeal before the County Board of Appeals. At Step 7, if the appeal is denied and compliance is achieved, the case is closed. If the appeal is denied, and no further appeal is taken, but compliance has not been achieved, the City will commence a civil enforcement action for injunctive relief. At Step 8, if a court grants relief, the City will take abatement action in accordance with the court order.

not permitted to impose stricter standards than those imposed by the County. ¶ 3(b). A property owner or occupant may appeal any zoning citation or notice of violation issued by the City in enforcing the Zoning Ordinance to the County Board of Appeals. ¶ 3(c).

The MOU runs from year to year and will be extended automatically for a one-year term on December 1 of each subsequent year unless either party exercises its right to terminate it. ¶ 9. The MOU is "intended only for the benefit of the parties [*i.e.,* the City and the County], and no rights are intended or shall be deemed to be granted to any other persons." ¶ 10.

On October 22, 2002, the MOU was approved by a unanimous vote of the County Council. It then was approved by a unanimous vote of the City Council on November 19, 2002. From then until the present, the City has enforced the Zoning Ordinance through its Public Services Department ("PSD"). The City inspects for and investigates suspected violations of the Zoning Ordinance, including the lack of a required U&O Permit, and prosecutes those violations in court. The County continues to issue its U&O Permits and to conduct preliminary inspections for those permits. The County also continues to issue its own building permits; the City has no involvement in the enforcement of building permit violations.

**-b-**

**The City's Building Code and Occupancy Permits**

The City is empowered by Md. Code (2013), section 5-211(a) of the Local Government Article ("LG"), formerly codified at Md. Code (1957, 2001 Repl. Vol.), section 2(b) of Article 23A, to "adopt regulations regarding the erection of buildings and

signs," including by adopting a "building code" and "requirements for building permits." Under LG § 5-211(b), it may require "inspection of and require repairs to . . . drainage and sewage systems . . . electric lines and wires . . . gas pipes . . . plumbing apparatus . . . and . . . water pipes." Pursuant to this authority, in 1967, the City enacted a building code, now codified at Chapter 87 of the City Code.[3] The City requires a City building permit for any type of construction or demolition that will require a County building permit. City Code § 87-3.

In addition, the City is empowered by LG section 5-202, formerly codified at section 2(a) of Article 23A, to adopt ordinances to protect "persons and property from danger and destruction" and to "protect the health, comfort, and convenience of the residents of the municipality." It is further authorized by LG section 5-209, formerly codified at section 2(b) of Article 23A, to "regulate any place where noxious things are manufactured, offensive trades are conducted, or that may cause unsanitary conditions or conditions detrimental to health." Pursuant to that authority, in 1966, the City adopted Chapter 144 of the City Code, titled "Occupancy Permits." Chapter 144 requires any residential property that is rented and any non-residential property that must be issued a County U&O Permit to also have a City issued occupancy permit. The City employs six full-time code enforcement officers to perform initial occupancy permit inspections and annual health and safety inspections. It performs over 4,000 such inspections each year.

---

[3] The City adopted the County Building Code as its own building code. City Code, § 87-2.

**The Declaratory Judgment Action**

PSE operates a small engine repair and equipment distributorship business at the Property. On September 16, 1993, it was issued a County U&O Permit. It did not apply for or obtain a City occupancy permit, however. The City has issued numerous municipal infraction citations to PSE, as well as to other tenants at the Property, for failure to obtain a City occupancy permit. Hnarakis also was issued six municipal infraction citations for failing to obtain City building permits before undertaking construction at residential properties he owns in the City. Both PSE and Hnarakis defended against the infractions in proceedings before the District Court of Maryland, sitting in Prince George's County, by arguing that Paragraph 2(c) of the MOU prohibits the City from issuing any occupancy permits and building permits, including permits it is authorized to issue under the City Code. In some of the cases against PSE, this defense was successful and the municipal infractions against it were dismissed by the District Court; in others it was not successful. The defense was not successful for Hnarakis in any of the cases against him, and he was found guilty by the District Court. Hnarakis noted *de novo* appeals from those judgments to the Circuit Court for Prince George's County.

On December 1, 2014, during the pendency of some of the District Court cases, the appellees (including PSE) filed this declaratory judgment action. The operative complaint is the "Third Amended and Restated Complaint for Declaratory Relief," filed on October 9, 2015, as amended by the "First Amendment to Third Amended and

Restated Complaint for Declaratory Relief," filed on January 4, 2016 ("TAC"). In the

TAC, PSE, Hnarakis, and Stokes are plaintiffs and the County and City are defendants.

The TAC sets forth one count for declaratory relief and alleges that such relief is

appropriate because there have been inconsistent adjudications of the meaning of the

MOU by the District Court. The plaintiffs asked the court to declare and adjudge

whether the MOU bars the City from "requir[ing] owners of non-residential properties

within [its] corporate limits . . . to obtain non-residential occupancy permits or building

permits."[4]

On December 4, 2015, the City and the County moved for summary judgment.

They asserted that the MOU was unambiguous; that Paragraph 2(c) prohibits the City

from issuing *County* U&O Permits or from issuing *County* building permits; but that it

does not otherwise alter the City's powers under State law or modify the existing City

building code or the City occupancy permit requirements. They further argued that the

---

[4] On June 5, 2015, Hnarakis and the City entered into a "Consent Order Staying Proceedings" ("the Consent Order") in Hnarakis's then pending circuit court appeals in six municipal infraction cases. Under the terms of the Consent Order, which was docketed on June 26, 2015, the appeals were stayed pending resolution of the instant case in the circuit court. Hnarakis agreed to amend his complaint in the declaratory judgment action to add the County as a defendant; to dismiss Jeannie Ripley, Code Enforcement Manager for the City, who originally had been named as a defendant; to add himself as a plaintiff; and to limit the declaratory relief requested to the determination whether Paragraph 2(c) of the MOU prohibits the City from requiring non-residential City occupancy permits and/or building permits. The parties agreed that if in the declaratory judgment action the City "obtain[ed] a final order . . . granting declaratory relief in its favor . . . then [Hnarakis would] dismiss the six (6) Appeals with prejudice." If Hnarakis were granted declaratory relief in his favor, the "orders on appeal from the District Court of Prince George's County [would] be vacated or affirmed consistent with the terms of such final order [in the declaratory judgment action]."

plaintiffs could not enforce the MOU because they were not parties to it or third party beneficiaries of it.

On February 18, 2016, the circuit court heard argument. On May 24, 2016, it issued a Memorandum and Order granting the plaintiffs the relief they sought. The court ruled that the MOU "restricts the authority of the City . . . from issuing building, grading, use and occupancy, or other permits that are now issued by the County" and that "both the County and City occupancy related permits involve an inspection of the property to ascertain if the structure is suitable for occupancy by the public." The court found that the City occupancy permit and the County U&O Permit differ only in that the City permit is issued annually, after a re-inspection, whereas the County permit is issued upon changes in the use or the occupant of the pertinent property. The MOU allows the City to make more frequent inspections to enforce the County U&O Permits, however. In the court's view, "while there may be differences between the City . . . occupancy permit and the [U&O Permit] issued by the County, [the two permits] serve essentially the same purpose in violation of the MOU." The court declared that under the MOU the City is prohibited from requiring any person to obtain a City occupancy permit for any non-residential property if he or she already has obtained a County U&O Permit and prohibited from requiring any person to obtain a building, grading, or other construction permit for a property if he or she already has obtained a County building permit. The court stated that the MOU does not restrict the City from using its "police power for the purpose of health, safety, and welfare, including but not limited to, annual inspections[.]"

This timely appeal followed.

-9-

The appellants contend the circuit court erred as a matter of law by construing the MOU to limit the City's preexisting powers to regulate building and health and safety within its municipal boundaries. It maintains that Paragraph 1(b) of the MOU makes plain that the City is not "for[e]going any other power granted to it by State law by reason of entering into the MOU," which includes those powers granted to it by State law (in the LG Article) to regulate building and health and safety through its own building and occupancy permit ordinances. It further argues that the circuit court's construction of the MOU is contrary to LU section 22-219, which does not require a municipality to give up powers conferred upon it by other State law in order to exercise its concurrent jurisdiction to enforce the County Zoning Ordinance.

The appellees respond that the plain language of Paragraph 2(c) of the MOU, read in conjunction with Paragraph 3(b)'s prohibition on the City's "impos[ing] standards or requirements which the Zoning Ordinance does not establish," prohibits the City from requiring duplicative or more stringent permits than the County permits. It maintains that the circuit court correctly determined that the occupancy permits required by the City do not differ in any significant respect from the County U&O Permits and therefore are prohibited.

"Maryland courts adhere to the principle of the objective interpretation of contracts . . . ; *i.e.*, if the language employed is unambiguous, 'a court shall give effect to its plain meaning and there is no need for further construction by the court.'" *Walker v. Dep't of Human Resources*, 379 Md. 407, 421 (2004) (quoting *Wells v. Chevy Chase*

*Bank*, 363 Md. 232, 251 (2001)). "We . . . attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect." *Id.* "Only when the language of the contract is ambiguous will we look to extraneous sources for the contract's meaning." *Brendsel v. Winchester Constr. Co. Inc.*, 392 Md. 601, 624 (2006). "[T]he determination of whether a contract is ambiguous . . . is a question of law . . . subject to *de novo* review." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163 (2003).

We agree with the appellants that the pertinent language of the MOU is not ambiguous and plainly does *not* limit the City's power to require City issued building permits and non-residential occupancy permits. We explain.

The MOU is an agreement between the City and the County by which the County delegates to the City, and the City assumes, the power to enforce the County Zoning Ordinance within the City. Paragraph 2 authorizes the City to cite properties for violating the Zoning Ordinance if they fail to seek and obtain a County U&O Permit or they engage in a use of the property that is inconsistent with the permit; and it further authorizes the City to prosecute those violations if the property owner fails to remedy the violation. ¶ 2(a) & (b). If a property owner or occupant has applied for a U&O Permit, however, and that application remains pending before the County, the City may not cite the property owner or occupant for a violation of the Zoning Ordinance. ¶ 2(b). Relatedly, the City is not authorized to "issue building, grading, [U&O], or other permits *now issued by the County Department of Environmental Resources*[;] . . . to override Department interpretations of the [Zoning] Ordinance in issuing permits[; or] . . . to

-11-

perform inspections for permit applications." ¶ 2(c) (emphasis added). Subparagraph 2(c) plainly reserves to the County the authority to issue its own (County) U&O permits and building permits, making clear that the City has no power to issue permits that are issued by the County. That subparagraph pertains only to County permits; nothing in its language restricts the City from requiring its own (City) permits consistent with the City Code.

Subparagraph 1(b) of the MOU further clarifies that the City is not relinquishing its right to issue *its own* permits under the City Code. In that subparagraph, the parties expressly agree that by assuming the power to enforce the County Zoning Ordinance, the City is not giving up any "power or authority" conferred upon it by the Regional District Act or "*any other law.*" ¶ 1(b) (emphasis added). This necessarily includes the City's authority, conferred upon it by the LG Article, to adopt and enforce its own building code and to adopt and enforce its own health and safety regulations.

This construction of the MOU is consistent with the statutory grant of authority for municipal corporations to exercise concurrent jurisdiction to enforce the County Zoning Ordinance. LU section 22-119 does not mandate that a municipal corporation surrender its powers under the LG Article to regulate health, safety, and welfare in order to accept a delegation of authority to enforce the County Zoning Ordinance. Rather, it requires the County and the municipal corporation to reach an agreement respecting the division of authority between the entities to prevent inconsistent enforcement. LU § 22-119(b). If the legislature had intended for the assumption of zoning enforcement powers by a

-12-

municipal corporation to be conditioned upon its forfeiting other statutory grants of authority, it would have said so.[5]

The circuit court's ruling in this case deviated from a plain language interpretation of the MOU and veered into an unnecessary and immaterial assessment of whether inspections performed by the City under its own ordinances duplicate some of the inspections performed by the County under its Zoning Ordinance. None of that is relevant. What matters is the language of the MOU, and that language makes clear that by assuming the County's enforcement power under the County Zoning Ordinance, the City does not give up any of its power, under the LG Article, to adopt and enforce its own building code and health, safety, and welfare regulations.

For all of these reasons, we hold that the circuit court erred as a matter of law by entering judgment in favor of the appellees.

**JUDGMENT REVERSED. COSTS TO BE PAID BY THE APPELLEES.**

---

[5]As an alternative basis for reversal, the appellants contend, as they did below, that the appellees could not sue to enforce the terms of the MOU because they are not parties to or intended third party beneficiaries of that agreement. They explain that they do not maintain that the appellees lacked standing, but merely that they cannot "re-interpret the terms of the MOU" inconsistent with the interpretation advanced by the contracting parties. Because we agree with the appellants that the MOU clearly does not limit the City's authority to issue building permits and non-residential occupancy permits under City law, we need not address this argument. We note, however, that the appellees were not seeking to enforce the MOU; they were asking the circuit court to interpret its language, thereby declaring the rights of the parties to the MOU and others affected by it.